HIRAM CRAIG, JOHN MOORE AND EPHRAIM MOORE *vs.* THE STATE
OF MISSOURI.

On the 27th day of June 1821, the legislature of the state of Missouri passed an
act, entitled " an act for the establishment of loan offices;" by the third section
of which, the officers of the treasury of the state, under the direction of the
governor, were required to issue certificates to the amount of two hundred
thousand dollars, of denominations not exceeding ten dollars, nor less than fifty
cents, in the following form : " *This certificate shall be receivable at the trea-
sury, of any of the loan offices in the state of Missouri, in discharge of taxes
or debts due to the state, for the sum of ———— dollars, with interest for the
same, at the rate of two per centum per annum from this date.*" These
certificates were to be receivable at the treasury, and by tax gatherers and
other public officers, in payment of taxes, or moneys due or to become due to
the state, or to any town or county therein, and by all officers, civil and mili-
tary, in the state, in discharge of salaries and fees of office; and in payment
for salt made at the salt springs owned by the state, and to be afterwards leased
by the authority of the legislature. The twenty-third section of the act pledges
certain property of the state for the redemption of these certificates ; and the
law authorises the governor to negotiate a loan of silver or gold for the same
purpose. A provision is made in the law for the gradual withdrawal of the
certificates from circulation ; and all the certificates have since been redeem-
ed. The commissioners of the loan offices were authorised to make loans
of the certificates to citizens of the state, assigning to each district a proportion
of the amount of the certificates, to be secured by mortgage or personal secu-
rity ; the loans to bear interest not exceeding six per cent per annum, and the
loans on personal property to be for less than two hundred dollars. *Held,* that
the certificates issued under the authority of the law of Missouri, were " bills
of credit;" and that their emission was prohibited by the constitution of the
United States, which declares that no state shall " emit bills of credit."

A promissory note given for certificates issued at the loan office of Chariton in
Missouri, payable to the state of Missouri, under the act of the legislature
" establishing loan offices," is void.

The action was assumpsit on a promissory note, and the record stated, " that
neither party having required a jury, the cause was submitted to the court; and
the court having seen and heard the evidence, the court found that the defend-
ants did assume as the plaintiff had declared ; that the consideration for the
note and the assumpsit, was for loan office certificates, loaned by the state of
Missouri at her loan office in Chariton, which certificates were issued under
" an act for establishing loan offices, &c." *Held,* that it could not be doubt-
ed that the declaration is on a note given in pursuance of the act of Missouri ;
and that under the plea of non assumpsit, the defendants were at liberty to
question the validity of the consideration which was the foundation of the
contract ; and the constitutionality of the law in which it originated. The re-
cord, thus exhibiting the case, gives jurisdiction to this court over the case ; on

[Craig et al. *vs.* The State of Missouri.]

a writ of error prosecuted by the defendants to this court from the supreme court of Missouri, under the provisions of the twenty-fifth section of the judiciary act of 1789.

Every thing which disaffirms the contract; every thing which shows it to be void; may be given in evidence on the general issue, in an action of assumpsit. [426]

In its enlarged, and perhaps literal sense, the term, "bill of credit," may comprehend any instrument by which a state engages to pay money at a future day; thus including a certificate given for money borrowed. But the language of the constitution itself, and the mischief to be prevented, equally limit the interpretation of the terms. The word "emit" is never employed in describing those contracts by which a state binds itself to-pay money at a future day for services actually received, or for money borrowed for present use. Nor are instruments executed for such purposes, in common language, denominated "bills of credit." "To emit bills of credit," conveys to the mind the idea of issuing paper intended to circulate through the community, for its ordinary purposes, as money; which paper is redeemable at a future day. This is the sense in which the terms have always been understood. [431]

The constitution considers the emission of bills of credit, and the enactment of tender laws as distinct operations; independent of each other; which may be separately performed. Both are forbidden. To sustain the one, because it is not also the other; to say that bills of credit may be emitted, if they be not made a tender in payment of debts; is, in effect, to expunge that distinct independent prohibition, and to read the clause as if it had been entirely omitted. [434]

It has been long settled that a promise made in consideration of an act which is forbidden by the law, is void. It will not be questioned, that an act forbidden by the constitution of the United States, which is the supreme law, is against law. [436]

WRIT of error to the supreme court of the state of Missouri.

In 1823, an action of trespass on the case was instituted in the circuit court for the county of Chariton, in the state of Missouri, by the state of Missouri, against Hiram Craig and others. The declaration sets forth the cause of action in the following terms:

"For, that whereas, heretofore, on the 1st day of August, in the year of our lord 1822, at the county of Chariton, aforesaid, the said Craig, John Moore, and Ephraim Moore, made their certain promissory note in writing, bearing date the day and year aforesaid, and now to the court here shown, and thereby, and then and there, for value received, jointly, and severally, promised to pay to the state of Missouri, on the 1st day of November 1822, at the loan office in Chariton, the sum of one hundred and ninety-nine dollars

[Craig et al. *vs.* The State of Missouri.]

and ninety-nine cents, and the two per centum per annum, the interest accruing on the certificates borrowed, from the 1st day of October 1821. Nevertheless, the said Hiram Craig, John Moore, and Ephraim Moore, did not on the 1st day of November, or at any time before or since, pay to the state of Missouri, at the loan office in Chariton, the said sum of one hundred and ninety-nine dollars and ninety-nine cents, or the two per centum per annum, the interest accruing on the certificates borrowed, from the 1st day of October 1821; but the same to pay, &c."

To this declaration the defendants pleaded the general issue; and neither party requiring a trial by jury, the case was submitted to the court on the evidence and the arguments of counsel. The record contained the following entry of the proceedings of the court:

"And afterwards, at a court began and held at Chariton, on Monday the 1st day of November 1824, and on the second day of said court, in open court, the parties came into court by their attorneys, and neither party requiring a jury, the cause is submitted to the court; therefore, all and singular the matter and things and evidences being seen and heard by the court, it is found by them, that the said defendants did assume upon themselves, in manner and form as the plaintiffs, by their counsel, allege: and the court also find that the consideration for which the writing declared upon, and the *assumpsit* was made, was for the loan of loan office certificates, loaned by the state at her loan office at Chariton; which certificates were issued, and the loan made in the manner pointed out by an act of the legislature of the said state of Missouri, approved the 27th day of June 1821, entitled, ' an act for the establishment of loan offices, and the acts amendatory and supplementary thereto.': And the court do further find that the plaintiff hath sustained damages by reason of the non-performance of the assumptions and undertakings of them, the said defendants, to the sum of two hundred and thirty-seven dollars and seventy-nine cents. Therefore it is considered, &c."

The defendants in the circuit court of the county of Chariton appealed, in 1825, to the supreme court of the state of

Missouri, the highest tribunal in that state ; where the judg-ment of the circuit court was affirmed.

The defendants prosecuted this writ of error, under the twenty-fifth section of the judiciary act of 1789.

The act of the legislature of Missouri, under which the certificates were issued which formed the consideration of the note declared upon, was passed on the 27th of June 1821. It is entitled " an act for the establishment of loan offices, &c." The provisions of the third, thirteenth, fifteenth, sixteenth, twenty-third and twenty-fourth sections of the act, are all that have a connexion with the questions in the case which were before the court.

" Sec. 3. *Be it further enacted,* That the auditor of public accounts and treasurer, under the direction of the governor, shall, and they are hereby required to issue certificates signed by the said auditor and treasurer to the amount of two hundred thousand dollars, of denominations not exceeding ten dollars, nor less than fifty cents, (to bear such devices as they may deem the most safe) in the following form, to wit : *This certificate shall be receivable at the treasury or any of the loan offices of the state of Missouri, in the discharge of taxes or debts due to the state, for the sum of $ ———, with interest for the same, at the rate of two per centum per annum from this date, the ——— day of ——— 182*

" Sec. 13. *Be it further enacted,* That the certificates of the said loan office shall be receivable at the treasury of the state, and by all tax gatherers and other public officers, in payment of taxes or other moneys now due, or to become due to the state or any county or town therein ; and the said certificates shall also be received by all officers civil and military in the state, in discharge of salaries and fees of office.

" Sec. 15. *Be it further enacted,* That the commissioners of the said loan offices shall have power to make loans of the said certificates to citizens of this state, residing within their respective districts only ; and in each district a proportion shall be loaned to the citizens of each county therein, according to the number thereof, secured by mortgage or personal security : *Provided,* That the sum loaned on mortgage shall

never exceed one half the real unincumbered value of the estate so mortgaged: *Provided also*, That no loans shall ever be made for a longer period than one year, nor at a greater interest than at the rate of six per cent per annum, which interest shall be always payable in advance, nor shall a loan in any case be renewed, unless the interest on such re-loan be also paid in advance: *Provided also*, That the commissioners aforesaid shall never make a call for the payment of any instalment at a greater rate than ten per centum for every six months; and that whenever any instalment to a greater amount than at the rate of ten per centum per annum be required, at least sixty days previous notice shall be given to the person or persons thus required to pay: *And provided also*, That all and every person failing to make payment shall be deprived in future of credit in such office, and be liable to suit immediately, for the whole amount by him or them due.

" Sec. 16. *Be it further enacted*, That the said commissioners of each of the said offices are further authorised to make loans on personal securities, by them deemed good and sufficient, for sums less than two hundred dollars; which securities shall be jointly and severally bound for the payment of the amount so loaned, with interest thereon, under the regulations contained in the preceding section of this act."

" Sec. 23. *Be it further enacted*, That the general assembly shall, as soon as may be, cause the salt springs and lands attached thereto given by congress to this state, to be leased out, and it shall always be the fundamental condition in such leases, that the lessee or lessees shall receive the certificates hereby required to be issued, in payment for salt, at a price not exceeding that which may be prescribed by law; and all the proceeds of the said salt springs, the interest accruing to the state; and all estates purchased by officers of the several offices, under the provisions of this act, and all the debts now due, or hereafter to be due to this state, are hereby pledged, and constituted a fund for the redemption of the certificates hereby required to be issued; and the faith of the state is hereby also pledged for the same purpose.

" Sec. 24. *Be it further enacted*, That it shall be the duty of the auditor and treasurer to withdraw, annually, from circu-

[Craig et al. *vs*. The State of Missouri.]

lation one tenth part of the certificates which are hereby re-- quired to be issued, &c."

The case was argued by Mr Sheffey for the plaintiffs in error; and by Mr Benton for the state of Missouri.

Mr Sheffey, for the plaintiffs in error, contended,

1. That the record shows a proper case for the jurisdiction of this court, within the provisions of the twenty-fifth section of the judiciary act of 1789.

2. That the act of the legislature of Missouri, entitled "an act for the establishment of loan offices," is unconstitutional and void; being repugnant to the provision of the constitution of the United States, which declares that no state shall emit bills of credit.

3. That the state of Missouri has no right to recover on the promissory note which is the foundation of this suit, because the consideration was illegal.

He argued, that this case comes fully within the purpose, spirit, and letter of the twenty-fifth section of the judiciary act of 1789. The purpose of that section was, to place within the revising, controlling, and correcting power of the supreme court of the United States, any violations of the constitution of the United States, or of treaties, by state legislation. The harmony of the government, its equal operation, the preservation of its fundamental principles, the peace of the nation, rest securely upon the execution of this power of the supreme court. While this power would be cautiously used; it would be fearlessly asserted and employed, when it was required of the court, and enjoined on the judges. The government of the United States was one for the whole of "the people of the United States." It was formed for "the people;" and its solemn and impressive preamble contains the declaration, that, "we, the people of the United States, in order to form a more perfect union," "do ordain and establish this constitution of the United States."

To keep the constitution perfect, and preserve it as a government for "the whole people, the twenty-fifth section of the judiciary law of 1789 was enacted. This law

brought into exercise the constitutional powers of the court, but it created no new powers.

In the case of Martin vs. Hunter's Lessee, 1 Wheat. 304, 330, this court have said, "the twenty-fifth section of the judiciary act of September 24, 1799, is supported by the letter and spirit of the constitution." And in the same case (p. 324) they say, "the constitution of the United States was ordained and established," not by the United States in their sovereign capacities; but, as the preamble declares, "by *the people of the United States.*"

That a tribunal should exist, before which questions of a constitutional character may be brought, is not denied by any one; and the constitution itself has provided that which now entertains such questions. It has given to this court the powers which they exercise; great, extensive, superior and responsible as they are; that this court may stand forth as the guardians of the rights of the people claimed and declared in the constitution, and that those rights may be protected from encroachment and destruction. To this court "the people" look for this protection; and when the invader of their rights is a sovereign state, they have not the less confidence and assurance, that the principles of the government will be preserved. This court know no parties to the cases which come before them for decision. It is the principles which are to govern their decisions in those cases, to which the court look; and they leave to those from whom their powers are derived, to "the people of the United States," to decide; not upon their rightful and constitutional exercise of those powers, for to the constitution they are answerable only for their exercise; but whether they shall continue so to use them. The whole people of the United States have given these powers: and they only, by a majority; and not a portion of them less than this constitutional whole; can nullify those powers, or interrupt the exercise of any which are regularly applied under the constitution. The constitution must be changed by the *whole people*, before the exercise of this power of revision can cease.

This court have never been willing to employ its powers of inquiring into the constitutionality of laws, but where the

[Craig et al. *vs.* The State of Missouri.]

obligation was imperative, and the case was one clearly within their duties. In the case of Fletcher *vs.* Peck, 6 Cranch, 128, the court declared, " the question, whether a law be void for its repugnancy to the constitution, is a question which ought seldom, if ever, to be decided in a doubtful case. The opposition between the constitution and the law should be such, that the judge feels a clear and strong conviction of their incompatibility with each other."

To present the question in the case now before the court, no plea was necessary; the defence arises under the general issue.

The record shows that this was a case, in the courts of the state of Missouri, in which the constitutionality of a law of that state was brought into question. The cause of action is stated to be promissory notes given for certificates issued under the act of the legislature of Missouri establishing loan offices; and the validity of these certificates must have been the whole subject of inquiry in the state courts. Their validity depended solely on the harmony of that act with the federal compact; and the courts of Missouri could only have affirmed their validity by affirming the act under which they were issued to be constitutional and valid; or in other terms, not repugnant to the constitution of the United States.

This is not a new question. It has been frequently presented to this court; and has been uniformly decided according to the views of the plaintiffs in error. Martin *vs.* Hunter's Lessee, 1 Wheat. 355. Miller *vs.* Nicholls, 4 Wheat. 311. Williams *vs.* Norris, 12 Wheat. 117. In Wilson *vs.* The Black Bird Creek Marsh Company, 2 Peters, 251, the court say : "it is sufficient to bring the case within the provisions of the twenty-fifth section of the judicial act, if the record shows that the constitution or a law or a treaty has been misconstrued, or the decision could not be made."

2. The certificates issued by the state of Missouri under the law are " bills of credit;" and thus the law conflicts with the constitution of the United States. They are issued under the authority of the state, and put into circulation by the state; as the representative of money; as a substitute

for it; to perform the functions of money, by becoming the medium of circulation.

The prohibition of the constitution is in these terms; and every word in the clause is important and emphatic : " No state shall" " coin money," " emit bills of credit," " make any thing but gold and silver coin a tender in payment of debts."

What is the form and meaning of these bills ? They purport to be receivable at the treasury, or any loan office of the state, in discharge of taxes or debts due to the state. They are issued of different denominations, from two hundred dollars, to fifty cents, payable to no particular person ; they are, by the twenty-third section of the law, to be received for salt, by the lessees of the property of the state ; by the officers of the state, in discharge of their salaries and fees of office. They pass, by delivery, with every characteristic of money. It is only necessary to state these, the purposes of their issue ; the character and form of the certificates ; the obligation imposed on the citizens of Missouri to receive them ; to establish that they are " bills of credit ;" " emitted" " by the state" of Missouri ; or " coined" money : and that, not being " gold or silver," they are " a tender in payment of debts."

The sufferings of the people of the United States from the issues of paper money, or " bills of credit," during the revolution, were yet in full operation when the constitution was formed. While it might be dangerous to deny that many of the means of the war were procured by the emission of that money; the exigencies of the country, strugling for existence, were the only safe apology for their use. When the confederated states were about to become a nation, which should owe its prosperity to sound and just and equal principles; the opportunity to reproduce the same state of things, the same wide and wasteful ruin by the acts of any of the members of the confederacy, was at once decisively and explicitly prohibited by those who formed the constitution. But, if it is contended, that the certificates issued by the state of Missouri were not " bills of credit," because it is said they are not declared by the act which directs their emission to be " a legal tender ;" it is asserted,

[Craig et al. *vs.* The State of Missouri.]

that if even they are not such, it is not essential to " a bill of credit" that it shall have that incident. The Federalist, No. 44. Many of the bills issued by the states during the war were not made a legal tender; but they circulated widely, and with equally disastrous consequences. 9 Virgin. Stat. at large, 67, 147, 223, 480, &c.

In relation to money as a circulating medium, the states are one. All and each have one and the same interest in a sound currency. These interests are a unit; not only from the neighbourhood of the states to each other, the identity of their interests, and their free and unrestrained intercourse; but because the regulations of the constitution embrace the whole subject of money as a circulating medium.

To the existence of the government, certainly to its convenient fiscal operations, a uniform currency is important, if not essential; and if the principles which may be fairly drawn from a sound construction of the provision in the constitution under examination, extend to bring into doubt the legality of bank notes circulated as money, *under the charters granted to banks by state laws;* these principles may not be the less true, or their importance of the less magnitude.

3. If the certificates for which promissory notes were given are void, and the act of the legislature of Missouri on which they are founded was against the constitution of the United States; the note upon which this action was brought in the circuit court of Missouri was without consideration, and void. The state cannot receive upon such notes.

Mr Benton for the defendant in error.

The state of Missouri has been " summoned" by a writ from this court, under a " penalty," to be and appear before this court. In the language of the writ, she is " commanded" and " enjoined" to appear. Language of this kind does not seem proper, when addressed to a sovereign state : nor are the terms fitting, even if the only purpose of the process was to obtain the appearance of the state. They impute " a fault" in the state ; they imply an omission, or neglect by the state.

The language of "commanding and enjoining" would only be well employed if these had occurred.

The state of Missouri has done no act which was not within the full and ample powers she possesses as a free, sovereign, and independent state. She has passed a law which she considers in the proper and beneficial exercise of her legislative functions; and which had for its object the promotion of the interests of her citizens.

Mr Benton said, that he did not appear in this case for the state of Missouri, as in ordinary cases depending in this court: not as the advocate of the state; for her acts did not require the efforts of an advocate to vindicate them: he appeared rather as a "corps of observation," to watch what was going on.

The state had passed a law authorising the governor to employ counsel, and he had been called upon to represent the state. He had listened to what had been going on before the court; and he found a gentleman from another state, imputing to Missouri an act fraught with injustice and immorality.

Such a course was not calculated to promote harmony, and to secure a continuance of the union. If, in questions of this kind, or if in any cases, the character of a sovereign state shall be made the subject of such imputation; this peaceful tribunal would not be enabled to procure the submission of the states to its jurisdiction; and contests about civil rights would be settled amid the din of arms, rather than in these halls of national justice.

The act of the legislature of Missouri, "establishing loan offices," had no purposes to accomplish by which injury could be sustained by any one. The deficiency of currency in the state, and the expenses which attended its new organization, made the arrangements proposed and authorised by the act convenient and beneficial to the citizens of the state. The state, when it directed that the certificates should be issued, made sufficient and certain provision for their redemption and payment. The permanent continuance of the circulation of the certificates was prohibited by an effective regulation in the bill: the twenty-fourth section

of the law provided for the gradual extinction of the certificates as they should come in; and power was given to the governor, by the twenty-ninth section of the law, to negotiate a loan of gold and silver for their redemption. Thus, the certificates were issued upon ample means for their discharge; and their discharge to their full value must soon take place.

These certificates were not made a legal tender. They are not directed to pass as " money :" and while there is no obligation imposed by the law, that they shall be taken by the citizens of the state; it declares that the state shall take them in payment for taxes, for salt, and for fees of office.

When examined, these certificates will be found to be nothing more than evidences of loans made to the state; and for the payment of which she has given specific and available pledges.

It will not be contended that the states have not power to borrow money : and what other form of certificate of a loan, than that which was adopted by the state of Missouri, can be devised, when this power is exercised. In every state of the union loans have been negotiable ; and certificates of the amount due by the state to the individual lenders are issued.

The certificates which were the consideration of the note, were therefore not " bills of credit," in the constitutional acceptation of such instruments.

An examination of the legislation of the states in which such bills were issued, and the proceedings under those laws, will clearly show that the condition of things in the view and recollection of the convention which formed the constitution, was different, in every essential feature, from that which was created by the law of Missouri. Massachusetts, in 1690, issued bills of credit to pay taxes and other debts due to the state treasury; but the soldiers, to whom they were offered, would not receive them. 1 Hutchinson's Hist. 402, 404. In 1714 and 1716, other issues were made, and they were directed to pass as *money, and made a tender.* In 1749 the issuing of such bills was discontinued.

During the revolution, the " bills of credit" which were

isssued by the authority of the states, and by that of congress, were in most cases made a tender; and this was the objectionable feature in them. So long as no objection to receive them is imposed by the law which directs or authorises their emission, they can injure no one. Free to refuse them, the citizen may protect himself from loss by their depreciation, by rejecting them.

The bills issued under the Missouri law have not this vice. That part of the law which obliges the officers of the state to receive them for salaries and fees, is not before the court. The notes in this suit were given voluntarily; and thus, in reference to the case of the plaintiffs in error, it cannot be said that the certificate given for the note had the character of "a legal tender."

In reference to the duty imposed on the lessees of the salt springs owned by the state, it should be known to the court, that when the "act for the establishment of loan offices" was passed, no leases had been given for those salt springs. If it was to be made a condition of the lease, to which the lessee would consent, that these certificates should be received for salt: it cannot therefore be said that any obligation was imposed on him, of which he could complain.

While, therefore, in every aspect of this case, those who consented to take these certificates could not be affected to their injury by their depreciation, they might be benefited by it; they could pay them to the state for taxes, for fees of office, and for salt at their nominal or par value.

An examination of the proceedings of the convention which formed the constitution of the United States, will show that the prohibition which is now supposed to operate on the law of Missouri, was carried by a majority of one vote. Journal of the Convention, 302. It should not be presumed, that this clause of the constitution was intended to extend to such issues as those authorised by the act of Missouri. The language of the constitution should be strictly construed; as it is a limitation on the sovereignty of a state.

All bank notes issued under state charters are equally within the constitutional prohibition, if the construction assumed by the counsel of the plaintiffs in error is correct.

[Cráig et al. *vs*. The State of Missouri.]

The "wolf scalp" certificates, by which the flocks and herds of the west are protected from the devastations of those destructive and numerous animals; the "crow certificates," the rewards of those who save the fields of the husbandman from the spoils of their worst enemies; are all receivable for taxes; and all are equally obnoxious to the exceptions taken to the certificates issued under the law of Missouri.

The consideration for the note which is the subject of this suit was a good and valuable consideration; and the note is binding on the parties to it, by the express terms of the sixteenth section of the law. The note furnished the parties with the means of paying their taxes, and was a benefit to them. All the certificates have been redeemed by the state.

Congress is not authorised to issue bills of credit. The states may do all that is not prohibited; while congress can do nothing which is not granted by the constitution. Congress had no express authority to issue treasury notes, but they were issued. These notes were precisely like the Missouri certificates.

The treasury notes were not bills of credit; for they were not made, by the act under which they were issued, a legal tender. They were freely circulated throughout the United States without objections; and they were most useful instruments in the financial operations of the government during the last war.

This court has not jurisdiction of the case. It is not within the requirements of the twenty-fifth section of the judiciary act. The validity of the state law was not drawn in question before the courts of Missouri; and no decision was made in those courts upon the validity of the objection now set up under the constitution of the United States.

The pleadings do not show that the law was drawn in question; they only deny the promise charged in the declaration. Upon the matters thus presented, and on no others, did the courts of Missouri decide.

Mr Sheffey, in reply. The whole argument on th part of the state of Missouri is founded on the assumptio that

the certificates are not bills of credit, because they are not made a legal tender.

The provision of the constitution was introduced to prevent a mischief; one of the most fatal effects on the property of the citizens of the United States: and thus considered, it is to be construed liberally. A strict construction, and particularly one which would render it inoperative, or feeble in its influence, would not be justifiable.

The evils are the same; and the notes will circulate as freely and as extensively, whether they are made a tender or not. Whatever paper promise is circulated on the credit of the state, is a bill of credit; and is within the sense of the constitution.

This provision in the constitution was introduced to prevent the states from resorting to state necessity as an apology for the issue of paper. The states are not allowed to " coin money;" and the object clearly was to prevent any thing being made by the states which would serve as a circulating medium.

The word " emit" is a peculiar expression. The states may borrow money, and give notes ; but that is not coining money, nor is it emitting bills of credit; and so " wolf and crow scalp certificates" are only evidence that the counties in the states which authorise them owe so much money for meritorious and beneficial services.

It is denied that the power of the United States to issue bills of credit, is the same which has been claimed by the state of Missouri under this law. It does not follow, that because the United States may issue such bills, the states may do so. The states are specially prohibited such issues by the constitution.

The proposition which was made in the convention to give to congress the power to issue bills of credit, may have been rejected because that power had been already given in the power to coin money, and regulate its value. Congress has this power, as an incident : like the power to issue debentures; which is exercised as an incident to the power to regulate commerce.

[Craig et al. vs. The State of Missouri.]

Mr Chief Justice Marshall delivered the opinion of the Court: Justices Thompson, Johnson, and M'Lean dissenting.

This is a writ of error to a judgment rendered in the court of last resort, in the state of Missouri; affirming a judgment obtained by the state in one of its inferior courts against Hiram Craig and others, on a promissory note.

The judgment is in these words: "and afterwards at a court," &c. "the parties came into court by their attorneys, and, neither party desiring a jury, the cause is submitted to the court; therefore, all and singular the matters and things being seen and heard by the court, it is found by them, that the said defendants did assume upon themselves, in manner and form, as the plaintiff by her counsel alleged. And the court also find, that the consideration for which the writing declared upon and the assumpsit was made, was for the loan of loan office certificates, loaned by the state at her loan office at Chariton; which certificates were issued, and the loan made in the manner pointed out by an act of the legislature of the said state of Missouri, approved the 27th day of June 1821, entitled an act for the establishment of loan offices, and the acts amendatory and supplementary thereto: and the court do further find, that the plaintiff has sustained damages by reason of the non-performance of the assumptions and undertakings of them, the said defendants, to the sum of two hundred and thirty-seven dollars and seventynine cents, and do assess her damages to that sum. Therefore it is considered," &c.

The first inquiry is into the jurisdiction of the court.

The twenty-fifth section of the judicial act declares, "that a final judgment or decree in any suit in the highest court of law or equity of a state, in which a decision in the suit could be had, where is drawn in question" "the validity of a statute of, or an authority exercised under any state, on the ground of their being repugnant to the constitution, treaties or laws of the United States, and the decision is in favour of such their validity," "may be re-examined, and reversed or affirmed in the supreme court of the United States."

To give jurisdiction to this court, it must appear in the

record, 1. That the validity of a statute of the state of Missouri was drawn in question; on the ground of its being repugnant to the constitution of the United States. 2. That the decision was in favour of its validity.

1. To determine whether the validity of a statute of the state was drawn in question, it will be proper to inspect the pleadings in the cause, as well as the judgment of the court.

The declaration is on a promissory note, dated on the 1st day of August 1822, promising to pay to the state of Missouri, on the 1st day of November 1822, at the loan office in Chariton, the sum of one hundred and ninety-nine dollars ninety-nine cents, and the two per cent. per annum, the interest accruing on the certificates borrowed from the 1st of October 1821. This note is obviously given for certificates loaned under the act, "for the establishment of loan offices." That act directs that loans on personal securities shall be made of sums less than two hundred dollars. This note is for one hundred and ninety-nine dollars ninety-nine cents. The act directs that the certificates issued by the state shall carry two per cent interest from the date, which interest shall be calculated in the amount of the loan. The note promises to repay the sum, with the two per cent interest accruing on the certificates borrowed, from the 1st day of October 1821. It cannot be doubted that the declaration is on a note given in pursuance of the act which has been mentioned.

Neither can it be doubted that the plea of non assumpsit allowed the defendants to draw into question at the trial the validity of the consideration on which the note was given. Every thing which disaffirms the contract, every thing which shows it to be void, may be given in evidence on the general issue in an action of assumpsit. The defendants, therefore, were at liberty to question the validity of the consideration which was the foundation of the contract, and the constitutionality of the law in which it originated.

Have they done so?

Had the cause been tried before a jury, the regular course would have been to move the court to instruct the jury that the act of assembly, in pursuance of which the note was given, was repugnant to the constitution of the United States;

[Craig et al. vs. The State of Missouri.]

and to except to the charge of the judges, if in favour of its validity : or a special verdict might have been found by the jury, stating the act of assembly, the execution of the note in payment of certificates loaned in pursuance of that act ; and referring its validity to the court. The one course or the other would have shown that the validity of the act of assembly was drawn into question, on the ground of its repugnancy to the constitution ; and that the decision of the court was in favour of its validity. But the one course or the other, would have required both a court and jury. Neither could be pursued where the office of the jury was performed by the court. In such a case, the obvious substitute for an instruction to the jury, or a special verdict, is a statement by the court of the points in controversy, on which its judgment is founded. This may not be the usual mode of proceeding, but it is an obvious mode ; and if the court of the state has adopted it, this court cannot give up substance for form.

The arguments of counsel cannot be spread on the record. The points urged in argument cannot appear. But the motives stated by the court on the record for its judgment, and which form a part of the judgment itself, must be considered as exhibiting the points to which those arguments were directed, and the judgment as showing the decision of the court upon those points. There was no jury to find the facts and refer the law to the court ; but if the court, which was substituted for the jury, has found the facts on which its judgment was rendered ; its finding must be equivalent to the finding of a jury. Has the court, then, substituting itself for a jury, placed facts upon the record, which, connected with the pleadings, show that the act in pursuance of which this note was executed was drawn into question, on the ground of its repugnancy to the constitution ?

After finding that the defendants did assume upon themselves, &c. the court proceeds to find " that the consideration for which the writing declared upon and the assumpsit was made, was the loan of loan office certificates loaned by the state at her loan office at Chariton ; which certificates were issued and the loan made, in the manner pointed out

by an act of the legislature of the said state of Missouri, approved the 27th of June 1821, entitled," &c.

Why did not the court stop immediately after the usual finding that the defendants assumed upon themselves? Why proceed to find that the note was given for loan office certificates issued under the act contended to be unconstitutional, and loaned in pursuance of that act; if the matter thus found was irrelevant to the question they were to decide?

Suppose the statement made by the court to be contained in the verdict of a jury which concludes with referring to the court the validity of the note thus taken in pursuance of the act; would not such a verdict bring the constitutionality of the act, as well as its construction, directly before the court? We think it would: such a verdict would find that the consideration of the note was loan office certificates, issued and loaned in the manner prescribed by the act. What could be referred to the court by such a verdict, but the obligation of the law? It finds that the certificates for which the note was given, were issued in pursuance of the act, and that the contract was made in conformity with it. Admit the obligation of the act, and the verdict is for the plaintiff; deny its obligation, and the verdict is for the defendant. On what ground can its obligation be contested, but its repugnancy to the constitution of the United States? No other is suggested. At any rate, it is open to that objection. If it be in truth repugnant to the constitution of the United States, that repugnancy might have been urged in the state, and may consequently be urged in this court; since it is presented by the facts in the record, which were found by the court that tried the cause.

It is impossible to doubt that, in point of fact, the constitutionality of the act, under which the certificates were issued that formed the consideration of this note, constituted the only real question made by the parties, and the only real question decided by the court. But the record is to be inspected with judicial eyes; and, as it does not state in express terms that this point was made, it has been contended that this court cannot assume the fact that it was made or determined in the tribunal of the state.

The record shows distinctly that this point existed, and that no other did exist; the special statement of facts made by the court as exhibiting the foundation of its judgment contains this point and no other. The record shows clearly that the cause did depend, and must depend, on this point alone. If in such a case, the mere omission of the court of Missouri, to say, in terms, that the act of the legislature was constitutional, withdraws that point from the cause, or must close the judicial eyes of the appellate tribunal upon it; nothing can be more obvious, than that the provisions of the constitution, and of an act of congress, may be always evaded; and may be often, as we think they would be in this case, unintentionally defeated.

But this question has frequently occurred; and has, we think, been frequently decided in this court. Smith *vs.* The State of Maryland, 6 Cranch, 286. Martin *vs.* Hunter's Lessee, 1 Wheat. 355. Miller *vs.* Nicholls, 4 Wheat. 311. Williams *vs.* Norris, 12 Wheat. 117. Wilson and others *vs.* The Black Bird Creek Marsh Company, 2 Peters, 245, and Harris *vs.* Dennie in this term; are all, we think, expressly in point. There has been perfect uniformity in the construction given by this court to the twenty-fifth section of the judicial act. That construction is, that it is not necessary to state, in terms, on the record, that the constitution, or a treaty or law of the United States has been drawn in question, or the validity of a state law, on the ground of its repugnancy to the constitution. It is sufficient if the record shows that the constitution, or a treaty or law of the United States must have been construed, or that the constitutionality of a state law must have been questioned; and the decision has been in favour of the party claiming under such law.

We think, then, that the facts stated on the record presented the question of repugnancy between the constitution of the United States and the act of Missouri to the court for its decision. If it was presented, we are to inquire,

2. Was the decision of the court in favour of its validity?

The judgment in favour of the plaintiff is a decision in favour of the validity of the contract, and consequently of

the validity of the law by the authority of which the contract was made.

The case is, we think, within the twenty-fifth section of the judicial act, and consequently within the jurisdiction of this court.

This brings us to the great question in the cause :   Is the act of the legislature of Missouri repugnant to the constitution of the United States?

The counsel for the plaintiffs in error maintain, that it is repugnant to the constitution, because its object is the emission of bills of credit contrary to the express prohibition contained in the tenth section of the first article.

The act under the authority of which the certificates loaned to the plaintiffs in error were issued, was passed on the 26th of June 1821, and is entitled "an act for the establishment of loan offices." The provisions that are material to the present inquiry, are comprehended in the third, thirteenth, fifteenth, sixteenth, twenty-third and twenty-fourth sections of the act, which are in these words: ·

Section the third enacts : "that the auditor of public accounts and treasurer, under the direction of the governor, shall, and they are hereby required to issue certificates, signed by the said auditor and treasurer, to the amount of two hundred thousand dollars, of denominations not exceeding ten dollars, nor less than fifty cents (to bear such devices as they may deem the most safe), in the following form, to wit: "This certificate shall be receivable at the treasury, or any of the loan offices of the state of Missouri, in the discharge of taxes or debts due to the state, for the sum of $ ———, with interest for the same, at the rate of two per centum per annum from this date, the ——— day of ——— 182. ."

The thirteenth section declares : "that the certificates of the said loan office shall be receivable at the treasury of the state, and by all tax gatherers and other public officers, in payment of taxes or other moneys now due to the state or to any county or town therein, and the said certificates shall also be received by all officers civil and military in the state, in the discharge of salaries and fees of office."

The fifteenth section provides : "that the commission-

[Craig et al. *vs.* The State of Missouri.]

ers of the said loan offices shall have power to make loans of the said certificates, to citizens of this state, residing within their respective districts only, and in each district a proportion shall be loaned to the citizens of each county therein, according to the number thereof," &c.

Section sixteenth.  "That the said commissioners of each of the said offices are further authorised to make loans on personal securities by them deemed good and sufficient, for sums less than two hundred dollars; which securities shall be jointly and severally bound for the payment of the amount so loaned, with interest thereon," &c.

Section twenty-third.  "That the general assembly shall, as soon as may be, cause the salt springs and lands attached thereto, given by congress to this state, to be leased out, and it shall always be the fundamental condition in such leases, that the lessee or lessees shall receive the certificates hereby required to be issued, in payment for salt, at a price not exceeding that which may be prescribed by law : and all the proceeds of the said salt springs, the interest accruing to the state, and all estates purchased by officers of the said several offices under the provisions of this act, and all the debts now due or hereafter to be due to this state ; are hereby pledged and constituted a fund for the redemption of the certificates hereby required to be issued, and the faith of the state is hereby also pledged for the same purpose."

Section twenty-fourth.  "That it shall be the duty of the said auditor and treasurer to withdraw annually from circulation, one-tenth part of the certificates which are hereby required to be issued," &c.

· The clause in the constitution which this act is supposed to violate is in these words : " No state shall" " emit bills of credit."

What is a bill of credit ?  What did the constitution mean to forbid ?

In its enlarged, and perhaps its literal sense, the term " bill of credit" may comprehend any instrument by which a state engages to pay money at a future day ; thus including a certificate given for money borrowed.  But the lan-

guage of the constitution itself, and the mischief to be prevented, which we know from the history of our country, equally limit the interpretation of the terms. The word " emit," is never employed in describing those contracts by which a state binds itself to pay money at a future day for services actually received, or for money borrowed for present use ; nor are instruments executed for such purposes, in common language, denominated " bills of credit." To " emit bills of credit," conveys to the mind the idea of issuing paper intended to circulate through the community for its ordinary purposes, as money, which paper is redeemable at a future day. This is the sense in which the terms have been always understood.

At a very early period of our colonial history, the attempt to supply the want of the precious metals by a paper medium was made to a considerable extent ; and the bills emited for this purpose have been frequently denominated bills of credit. During the war of our revolution, we were driven to this expedient; and necessity compelled us to use it to a most fearful extent. The term has acquired an appropriate meaning ; and " bills of credit" signify a paper medium, intended to circulate between individuals, and between government and individuals, for the ordinary purposes of society. Such a medium has been always liable to considerable fluctuation. Its value is continually changing ; and these changes, often great and sudden, expose individuals to immense loss, are the sources of ruinous speculations, and destroy all confidence between man and man. To cut up this mischief by the roots, a mischief which was felt through the United States, and which deeply affected the interest and prosperity of all ; the people declared in their constitution, that no state should emit bills of credit. If the prohibition means any thing, if the words are not empty sounds, it must comprehend the emission of any paper medium, by a state government, for the purpose of common circulation.

What is the character of the certificates issued by authority of the act under consideration ? What office are they to perform ? Certificates signed by the auditor and treasurer of the state, are to be issued by those officers to the

amount of two hundred thousand dollars, of denominations not exceeding ten dollars, nor less than fifty cents. The paper purports on its face to be receivable at the treasury, or at any loan office of the state of Missouri, in discharge of taxes or debts due to the state.

The law makes them receivable in discharge of all taxes, or debts due to the state, or any county or town therein; and of all salaries and fees of office, to all officers civil and military within the state; and for salt sold by the lessees of the public salt works. It also pledges the faith and funds of the state for their redemption.

It seems impossible to doubt the intention of the legislature in passing this act, or to mistake the character of these certificates, or the office they were to perform. The denominations of the bills, from ten dollars to fifty cents, fitted them for the purpose of ordinary circulation; and their reception in payment of taxes, and debts to the government and to corporations, and of salaries and fees, would give them currency. They were to be put into circulation; that is, emitted, by the government. In addition to all these evidences of an intention to make these certificates the ordinary circulating medium of the country, the law speaks of them in this character; and directs the auditor and treasurer to withdraw annually one-tenth of them from circulation. Had they been termed "bills of credit," instead of "certificates," nothing would have been wanting to bring them within the prohibitory words of the constitution.

And can this make any real difference? Is the proposition to be maintained, that the constitution meant to prohibit names and not things? That a very important act, big with great and ruinous mischief, which is expressly forbidden by words most appropriate for its description; may be performed by the substitution of a name? That the constitution, in one of its most important provisions, may be openly evaded by giving a new name to an old thing? We cannot think so. We think the certificates emitted under the authority of this act, are as entirely bills of credit, as if they had been so denominated in the act itself.

But it is contended, that though these certificates should be

deemed bills of credit, according to the common acceptation of the term, they are not so in the sense of the constitution; because they are not made a legal tender.

The constitution itself furnishes no countenance to this distinction. The prohibition is general. It extends to all bills of credit, not to bills of a particular description. That tribunal must be bold indeed, which, without the aid of other explanatory words, could venture on this construction. It is the less admissible in this case, because the same clause of the constitution contains a substantive prohibition to the enactment of tender laws. The constitution, therefore, considers the emission of bills of credit, and the enactment of tender laws, as distinct operations, independent of each other, which may be separately performed. Both are forbidden. To sustain the one, because it is not also the other; to say that bills of credit may be emitted, if they be not made a tender in payment of debts; is, in effect, to expunge that distinct independent prohibition, and to read the clause as if it had been entirely omitted. We are not at liberty to do this.

The history of paper money has been referred to, for the purpose of showing that its great mischief consists in being made a tender; and that therefore the general words of the constitution may be restrained to a particular intent.

Was it even true, that the evils of paper money resulted solely from the quality of its being made a tender, this court would not feel itself authorised to disregard the plain meaning of words, in search of a conjectural intent to which we are not conducted by the language of any part of the instrument. But we do not think that the history of our country proves either, that being made a tender in payment of debts, is an essential quality of bills of credit, or the only mischief resulting from them. It may, indeed, be the most pernicious; but that will not authorise a court to convert a general into a particular prohibition.

We learn from Hutchinson's History of Massachusetts, vol. 1, p. 402, that bills of credit were emitted for the first time in that colony in 1690. An army returning unexpectedly from an expedition against Canada, which had proved as disastrous as the plan was magnificent, found the govern-

ment totally unprepared to meet their claims. Bills of credit were resorted to, for relief from this embarrassment. They do not appear to have been made a tender; but they were not on that account the less bills of credit, nor were they absolutely harmless. The emission, however, not being considerable, and the bills being soon redeemed, the experiment would have been productive of not much mischief, had it not been followed by repeated emissions to a much larger amount. The subsequent history of Massachusetts abounds with proofs of the evils with which paper money is fraught, whether it be or be not a legal tender.

Paper money was also issued in other colonies, both in the north and south; and whether made a tender or not, was productive of evils in proportion to the quantity emitted. In the war which commenced in America in 1755, Virginia issued paper money at several successive sessions, under the appellation of treasury notes. This was made a tender. Emissions were afterwards made, in 1769, in 1771, and in 1773. These were not made a tender; but they circulated together; were equally bills of credit; and were productive of the same effects. In 1775 a considerable emission was made for the purposes of the war. The bills were declared to be current, but were not made a tender. In 1776, an additional emission was made, and the bills were declared to be a tender. The bills of 1775 and 1776 circulated together; were equally bills of credit; and were productive of the same consequences.

Congress emitted bills of credit to a large amount; and did not, perhaps could not, make them a legal tender. This power resided in the states. In May 1777, the legislature of Virginia passed an act for the first time making the bills of credit issued under the authority of congress a tender so far as to extinguish interest. It was not until March 1781 that Virginia passed an act making all the bills of credit which had been emitted by congress, and all which had been emitted by the state, a legal tender in payment of debts. Yet they were in every sense of the word bills of credit, previous to that time; and were productive of all the consequences of paper money. We cannot then assent to the proposition.

that the history of our country furnishes any just argument in favour of that restricted construction of the constitution, for which the counsel for the defendant in error contends.

The certificates for which this note was given, being in truth " bills of credit" in the sense of the constitution, we are brought to the inquiry :

Is the note valid of which they form the consideration ?

It has been long settled, that a promise made in consideration of an act which is forbidden by law is void. It will not be questioned, that an act forbidden by the constitution of the United States, which is the supreme law, is against law. Now the constitution forbids a state to " emit bills of credit." The loan of these certificates is the very act which is forbidden. It is not the making of them while they lie in the loan offices ; but the issuing of them, the putting them into circulation, which is the act of emission ; the act that is forbidden by the constitution. The consideration of this note is the emission of bills of credit by the state. The very act which constitutes the consideration, is the act of emitting bills of credit, in the mode prescribed by the law of Missouri ; which act is prohibited by the constitution of the United States.

Cases which we cannot distinguish from this in principle, have been decided in state courts of great respectability ; and in this court. In the case of the Springfield Bank *vs.* Merrick et al. 14 Mass. Rep. 322, a note was made payable in certain bills, the loaning or negotiating of which was prohibited by statute, inflicting a penalty for its violation. The note was held to be void. Had this note been made in consideration of these bills, instead of being made payable in them, it would not have been less repugnant to the statute ; and would consequently have been equally void.

In Hunt *vs.* Knickerbocker, 5 Johns. Rep. 327, it was decided that an agreement for the sale of tickets in a lottery, not authorised by the legislature of the state, although instituted under the authority of the government of another state, is contrary to the spirit and policy of the law, and void. The consideration on which the agreement was founded being illegal, the agreement was void. The books, both of

Massachusetts and New York, abound with cases to the same effect. They turn upon the question whether the particular case is within the principle, not on the principle itself. It has never been doubted, that a note given on a consideration which is prohibited by law, is void. Had the issuing or circulation of certificates of this or of any other description been prohibited by a statute of Missouri, could a suit have been sustained in the courts of that state, on a note given in consideration of the prohibited certificates? If it could not, are the prohibitions of the constitution to be held less sacred than those of a state law?

It had been determined, independently of the acts of congress on that subject, that sailing under the license of an enemy is illegal. Patton *vs.* Nicholson, 3 Wheat. 204, was a suit brought in one of the courts of this district on a note given by Nicholson to Patton, both citizens of the United States, for a British license. The United States were then at war with Great Britain; but the license was procured without any intercourse with the enemy. The judgment of the circuit court was in favour of the defendant; and the plaintiff sued out a writ of error. The counsel for the defendant in error was stopped, the court declaring that the use of a license from the enemy being unlawful, one citizen had no right to purchase from or sell to another such a license, to be used on board an American vessel. The consideration for which the note was given being unlawful, it followed of course that the note was void.

A majority of the court feels constrained to say that the consideration on which the note in this case was given, is against the highest law of the land, and that the note itself is utterly void. In rendering judgment for the plaintiff, the court for the state of Missouri decided in favour of the validity of a law which is repugnant to the constitution of the United States.

In the argument, we have been reminded by one side of the dignity of a sovereign state; of the humiliation of her submitting herself to this tribunal; of the dangers which may result from inflicting a wound on that dignity: by the other, of the still superior dignity of the people of the United States;

who have spoken their will, in terms which we cannot misunderstand.

To these admonitions, we can only answer : that if the exercise of that jurisdiction which has been imposed upon us by the constitution and laws of the United States, shall be calculated to bring on those dangers which have been indicated : or if it shall be indispensable to the preservation of the union, and consequently of the independence and liberty of these states : these are considerations which address themselves to those departments which may with perfect propriety be influenced by them. This department can listen only to the mandates of law ; and can tread only that path which is marked out by duty.

The judgment of the supreme court of the state of Missouri for the first judicial district is reversed ; and the cause remanded, with directions to enter judgment for the defendants.

Mr Justice JOHNSON.

This is a case of a new impression, and intrinsic difficulty ; and brings up questions of the most vital importance to the interests of this union.

The declaration is in the ordinary form ; and the part of the record of the state court, which raises the questions before us, is expressed in these words : " at a court, &c. came the parties, &c. and neither party requiring a jury, the cause is submitted to the court ; therefore, all and singular, the matters and things, and evidences, being seen and heard by the court, it is found by them that the said defendants did assume upon themselves in the manner and form as the plaintiffs by their counsel allege ; and the court also find that the consideration for which the writing declared upon, and the assumpsit was made, was for *the loan* of loan office certificates, loaned by the state at her loan office at Chariton ; which certificates were issued and the loan made in the manner pointed out by an act of the legislature of Missouri ; approved, &c. And the court do further find that the plaintiff hath sustained damages by reason of the non-performance of the assumptions and undertakings aforesaid, of them the said

defendants, to the sum, &c.; and therefore it is considered that the plaintiff recover," &c.

In order to understand the case, it may be proper to premise, that the territory now occupied by the state of Missouri having been subject to the Spanish government, was at the time of its cession governed by the civil law as modified by the Spanish government; that it so continued, subject to certain modifications introduced by act of congress, until it became a state; when the people incorporated into their institutions as much of the civil law as they thought proper: and hence, their courts of justice now partake of a mixed character, perhaps combining all the advantages of the civil and common law forms. By one of the provisions of this law the trial by jury is forced upon no one; is yet open to all; and when not demanded, the court acts the double part of jury and judge.

It is obvious, therefore, that the matter certified from the record of the state court before recited, is in nature of a special verdict, and the judgment of the court is upon that verdict: and in this light it shall be examined.

The purport of the finding is that the vote declared upon was given " for a loan of loan office certificates, loaned by the state under certain state acts, the caption of which is given."

Some doubts were thrown out in the argument, whether we could take notice of the state laws thus found, without being set out at length: but in this there can be no question; whatever laws that court would take notice of, we must of necessity receive and consider, as if fully set out.

By the acts of the state designated by the court in their finding, the officers of the treasury department of the state were authorised to create certificates of small denominations, from ten dollars down to fifty cents, bearing interest at two per centum per annum, and to loan these certificates to individuals; taking in lieu thereof promissory notes, payable not exceeding one year from the date, with not more than six per cent interest, and redeemable by instalments not exceeding ten per cent every six months, giving mortgages of landed property for security.

These certificates were in this form : " this certificate shall be receivable at the treasury, or any of the loan offices of the state of Missouri, in the discharge of taxes or debts due the state, for the sum of $——, with interest for the same, at the rate of two per centum per annum from this date, the —— day of —— 182 ;" which form is set out in, and prescribed by the act designated in the finding of the court.

This writ of error is sued out under the twenty-fifth section of the judiciary act; upon the supposition that the state act is in violation of that provision in the constitution which prohibits the states from emitting bills of credit; and that the note declared on is void, as having been taken for an illegal consideration, or without consideration.

As a preliminary question, it has been argued, that the case is not within the provisions of the twenty-fifth section ; because it does not appear from any thing on the record, that this ground of defence was specially set up in the courts of the state. But this we consider no longer an open question ; it has repeatedly been decided by this court, that if a special verdict or the instruction of a court involve such facts as that the judgment must necessarily affirm the validity of the state law, or invalidity of a right set up under the laws or constitution of the United States ; the case is sufficiently brought within the provisions of the twenty-fifth section.

The judgment of the court in this case affirms the validity of the contract on which the suit is instituted. And this could not have been affirmed, unless on the assumption that the act in which it had its origin was constitutional.

In the argument of counsel the objections to this contract were presented in the form of objections to the consideration. But this was unnecessary to his argument; since even a valuable consideration will not make good a contract in itself illegal. These notes originate directly under the law of Missouri; they are taken in pursuance of its provisions; have their origin in it; and rest for their validity upon it: and if that law be void, must fall with it. Whether, therefore,

the bills for which they were given be void or valid, if the law be void, the notes would be so.

There are some difficulties on the subject of consideration, for which I would reserve myself until they become unavoidable. But it is not one of those difficulties that, as a guide for the state, the power of the states over the law of contracts, will legalize a contract made, under whatever law, or for whatever consideration. That argument makes the act to justify itself; and is a direct recurrence to that exercise of sovereign power which it was the leading principle of the constitution that each should renounce, so far as it was incompatible with the provisions of the constitution; the objects of which were the security of individual right, and the perpetuation of the union.

The instrument is a dead letter, unless its effect be to invalidate every act done by the states in violation of the constitution of the United States. And as the universal modus operandi by free states must be through their legislature, it follows, that the laws under which any act is done, importing a violation of the constitution, must be a dead letter. The language of the constitution is, " no state shall emit bills of credit;" and this, if it means any thing, must mean that no state shall pass a law which has for its object an emission of bills of credit.

It follows, that when the officers of a state undertake to act upon such a law, they act without authority; and that the contracts entered into, direct or incidental to such their illegal proceedings, are mere nullities.

This leads us to the main question: " Was this an emission of bills of credit in the sense of the constitution?" And here the difficulty which presents itself is to determine whether it was a loan or an emission of paper money; or, perhaps, whether it was not an emission of paper money, under the disguise of a loan. There cannot be a doubt that this latter view of the subject must always be examined; for that which it is not permitted to do directly, cannot be legalized by any change of names or forms. Acts done " in fraudem legis," are acts in violation of law.

The great difficulty, as it is here, must ever be to deter-

mine, in each case, whether it be a loan, or an emission of bills of credit. That the states have an unlimited power to effect the one, and are divested of power to do the other, are propositions equally unquestionable; but where to draw the discriminating line is the great difficulty. I fear it is an insuperable difficulty.

The terms, " bills of credit," are in themselves vague and general, and, at the present day, almost dismissed from our language. It is then only by resorting to the nomenclature of the day of the constitution, that we can hope to get at the idea which the framers of the constitution attached to it. The quotation from Hutchinson's History of Massachusetts, therefore, was a proper one for this purpose; inasmuch as the sense in which a word is used, by a distinguished historian, and a man in public life in our own country, not long before the revolution, furnishes a satisfactory criterion for a defini-tion. It is there used as synonymous with paper money; and we will find it distinctly used in the same sense by the first congress which met under the present constitution.

. The whole history and legislation of the time prove that, by bills of credit, the framers of the constitution meant paper money, with reference to that which had been used in the states from the commencement of the century, down to the time when it ceased to pass, before reduced to its innate worthlessness.

. It was contended, in argument, for the defendant in error, that it was essential to the description of bills of credit in the sense of the constitution, that they should be made a lawful tender. But his own quotations negative that idea; and the constitution does the same, in the general prohibi-tion in the states to make any thing but gold or silver a le-gal tender. If, however, it were otherwise, it would hardly avail him here, since these certificates were, as to their offi-cers' salaries, declared a legal tender.

The great end and object of this restriction on the power of the states, will furnish the best definition of the terms under consideration. The whole was intended to exclude every thing from use, as a circulating medium, except gold and silver; and to give to the United States the exclusive

[Craig et.al. vs. The State of Missouri.]

control over the coining and valuing of the metallic medium. That the real dollar may represent property, and not the shadow of it.

Now, if a state were to pass a law declaring that this representative of money shall be issued by its officers, this would be a palpable and tangible case; and we could not hesitate to declare such a law, and every contract entered into on the issue of such paper, purporting a promise to return the sum borrowed, to be a mere nullity. But suppose a state enacts a law authorising her officers to borrow a hundred thousand dollars, and to give in lieu thereof certificates of one hundred dollars each, expressing an acknowledgement of the debt; it is presumed there could be no objection to this. Then suppose that the next year she authorises these certificates to be broken up into ten, five, and even one dollar bills. Where can be the objection to this? And if, at the institution of the loan, the individual had given for the script his note at twelve months, instead of paying the cash; it would be but doing in another form what was here done in Missouri; and what is often done, in principle, where the loan is not required to be paid immediately in cash.

Pursuing the scrutiny farther, and with a view to bringing it as close home to the present case as possible : a state having exhausted its treasury, proposes to anticipate its taxes for one, two or three years; its citizens, or others, being willing to aid it, give their notes payable at sixty days, and receive the script of the state at a premium, for the advance of their credit, which enables the state, by discounting these notes, to realise the cash. There could be no objection to this negotiation; and their script being by contract to be receivable in taxes, nothing would be more natural than to break it up into small parcels in order to adapt it to the payment of taxes. And if in this state it should be thrown into circulation, by passing into the hands of those who would want it to meet their taxes, I see nothing in this that could amount to a violation of the constitution. Thus far the transaction partakes of the distinctive features of a loan : and yet it cannot be denied that its adaptation to the payment of taxes does give it one characteristic of a circulating

medium. And another point of similitude, if not of identity, is the provision for forcing the receipt of it upon those to whom the state had incurred the obligation to pay money.

The result is, that these certificates are of a truly amphibious character; but what then should be the course of this court? My conclusion is, that, as it is a doubtful case, for that reason we are bound to pronounce it innocent. It does indeed approach as near to a violation of the constitution as it can well go, without violating its prohibition; but it is in the exercise of an unquestionable right, although in rather a questionable form; and I am bound to believe that it was done in good faith, until the contrary shall more clearly appear.

Believing it then a candid exercise of the power of borrowing, I feel myself at liberty to go further, and briefly to suggest two points, on which these bills vary from the distinctive features of the paper money of the revolution.

1. On the face of them they bear an interest; and for that reason vary in value every moment of their existence : this disqualifies them for the uses and purposes of a circulating medium ; which the universal consent of mankind declares should be of an uniform and unchanging value, otherwise it must be the *subject* of exchange, and not the *medium*.

2. All the paper medium of the revolution consisted of promises *to pay*. This is a promise *to receive*, and to receive in payment of debts and taxes due the state. This is not an immaterial distinction ; for the objection to a mere paper medium is, that its value depends upon mere national faith. But this certainly has a better dependence; the public debtor who purchases it may tender it in payment; and upon a suit brought to recover against him, the constitution contains another provision to which he may have recourse. As far as the feeble powers of this court extend, he would be secured (if he could ever need security) from a violation of his contracts. This approximates them to bills on a fund; and a fund not to be withdrawn by a law of the state.

Upon the whole, I am of opinion that the judgment of the state court should be affirmed.

[Craig et al. *vs*. The State of Missouri.]

Mr. Justice THOMPSON.

This case comes up by writ of error, from the state court of Missouri, on a judgment recovered against the plaintiffs in error, in the highest court in that state; and the first question that has been made here, is, whether this court has jurisdiction of the case, under the twenty-fifth section of the judiciary act of 1789.

If the construction of this twenty-fifth section was now for the first time brought before this court, I should entertain very serious doubts whether this case came within it. The fair, and as I think the clear import of that section is, that some one of the cases therein stated, did, *in point of fact*, arise, and was drawn into question; and did receive the judgment and decision of the state court. It is not enough, that such question *might* have been made. A party may waive the right secured to him under this section. This would not in any manner affect the jurisdiction of the state court; and might of course be waived. In the present case, there is no doubt but the facts which appeared before the state court presented a case which might properly fall within this section. The defendants might have insisted that the state law was unconstitutional, and that the certificates issued in pursuance of its provisions were void. And if the court had sustained the act, it would have been one of the cases within the twenty-fifth section. But the court was not bound to call upon the party to raise the objection, for the purpose of putting the cause in a situation to be brought here by writ of error. It cannot be doubted, but that there might have been an express waiver of this right; and I should think an implied waiver would equally preclude a review of the case by this court; and that such waiver ought to be implied in all cases where it does not appear, that in point of fact the question was made, and received the judgment of the state court. But to entertain jurisdiction in this case, is perhaps not going farther than this court has already gone, and I do not mean to call in question these decisions; but have barely noticed the question, for the purpose of stating the rule by which 1 think all cases under this section should be tested.

The more important question upon the merits of the case is, whether the constitution of the United States interposes any impediment to the plaintiff's right of recovery in this case. And this question has been presented at the bar under the following points:

1. Whether the certificates issued under the provisions of the law of the state of Missouri, are bills of credit, within the sense and meaning of the constitution.

2. If so, whether, as they formed the consideration of the note on which the judgment below was recovered, the note was rendered thereby void and irrecoverable.

The first is a very important question, and not free from difficulty; and one upon which I have entertained serious doubts: but looking at it in all its bearings, and considering the consequences to which the rule established by a majority of the court will lead, when carried out to its full extent, I am compelled to dissent from the opinion pronounced in this case.

The limitation upon the powers of the state of Missouri, which is supposed to have been transcended, is contained in the tenth section of the first article of the constitution of the United States. " No state shall emit bills of credit." Are the certificates issued under the authority of the Missouri law, bills of credit, within this prohibition?

The form of the certificate is prescribed in the third section of the act (act 27th of June 1821) as follows:

" This certificate shall be receivable at the treasury or any of the loan offices of the state of Missouri, in the discharge of taxes or debts due to the state, for the sum of $———, with interest for the same at two per centum per annum, from this date," &c. And the thirteenth section declares, " that the certificates of the said loan office shall be receivable at the treasury of the state, and by all tax gatherers and other public officers, in payment of taxes or other moneys now due, or to become due to the state, or any county or town therein; and the said certificates shall also be received by all officers, civil and military, in the state, in the discharge of salaries and fees of office." It is proper here to notice, that if the latter branch of this section should be considered as con-

flicting with that prohibition in the constitution, which declares that no state shall make any thing but gold and silver coin a tender in payment of debts; no such question is involved in the case now before the court, and the law may be good in part, although bad in part.

The precise meaning and interpretation of the terms, *bills of credit*, has no where been settled; or if it has, it has not fallen within my knowledge. As used in the constitution, it certainly cannot be applied to all obligations, or vouchers, given by, or under the authority of a state for the payment of money. The right of a state to borrow money cannot be questioned; and this necessarily implies the right of giving some voucher for the repayment: and it would seem to me difficult to maintain the proposition, that such voucher cannot legally and constitutionally assume a negotiable character; and as such, to a certain extent, pass as, or become a substitute for money. The act does not profess to make these certificates a circulating medium, or substitute for money. They are (except as relates to public officers) made receivable only for taxes and debts due to the state, and for salt sold by the lessees of salt springs belonging to the state. These are special and limited objects; and these certificates cannot answer the purpose of a circulating medium, to any considerable extent.

A simple promise to pay a sum of money, a bond or other security given for the payment of the same, cannot be considered a bill of credit, within the sense of the constitution. Such a construction would take from the states all power to borrow money, or execute any obligation for the repayment. The natural and literal meaning of the terms import a bill drawn *on credit merely*, and not bottomed upon any real or substantial fund for its redemption. There is a material and well known distinction between a bill drawn upon a fund, and one drawn upon credit only. A bill of credit may therefore be considered a bill drawn and resting merely upon the *credit* of the drawer; as contradistinguished from a *fund* constituted or pledged for the payment of the bill. Thus, the constitution vests in congress the power to borrow money on the credit of the United States. A bill drawn

under such authority would be a bill of credit. And this idea is more fully expressed in the old confederation, (Art. 9.) "Congress shall have power to borrow money or *emit bills* on the credit of the United States." Can the certificates issued under the Missouri law, according to the fair and reasonable construction of the act, he said to rest on the credit of the state? Although the securities taken for the certificates loaned are not in terms pledged for their redemption, yet these securities constitute a fund amply sufficient for that purpose, and may well be considered a fund provided for that purpose. The certificates are a mere loan upon security in double the amount loaned. And in addition thereto, (section 29), provision is made expressly for constituting a fund for the redemption of these certificates. These are guards and checks against their depreciation, by insuring their ultimate redemption.

The emissions of paper money by the states, previous to the adoption of the constitution, were, properly speaking, bills of credit; not being bottomed upon any fund constituted for their redemption, but resting solely for that purpose upon the credit of the state issuing the same. There was no check therefore upon excessive issues; and a great depreciation and loss to holders of such bills followed as matter of course. But when a fund is pledged, or ample provision made for the redemption of a bill or voucher, whatever it may be called, there is but little danger of a depreciation or loss.

But should these certificates be considered bills of credit, under an enlarged sense of such an instrument; it does not necessarily follow that they are bills of credit, within the sense and meaning of the constitution. As no precise and technical meaning or interpretation of a bill of credit has been shown, we may with propriety look to the state of things at the adoption of the constitution, to ascertain what was probably the understanding of the convention by this limitation on the power of the states. The state emissions of paper money had been excessive, and productive of great mischief. In some states, and at some times, such emissions were, by law, made a tender in payment of private debts, in others not so. But the great evil that existed was, that

[Craig et al. vs. The State of Missouri.]

creditors were compelled to take such a depreciated currency, and articles of property in payment of their debts. This being the mischief, is it an unfair construction of the constitution to restrict the intended remedy to the acknowledged and real mischief. The language of the constitution may perhaps be too broad to admit of this restricted application. But to consider the certificates in question bills of credit, within the constitution, is in my judgment a construction of that instrument which will lead to serious embarrassment with state legislation; as existing in almost every member of the union.

If these certificates are bills of credit, inhibited by the constitution; it appears to me difficult to escape the conclusion, that all bank notes, issued either by the states, or under their authority and permission, are bills of credit falling within the prohibition. They are certainly, in point of form, as much bills of credit; and if being used as a circulating medium, or substitute for money, makes these certificates bills of credit, bank notes are more emphatically such. And not only the notes of banks directly under the management and control of a state, of which description of banks there are several in the United States; but all notes of banks established under the authority of a state, must fall within the prohibition. For the states cannot certainly do that indirectly which they cannot do directly. And, if they cannot issue bank notes because they are bills of credit, they cannot authorise others to do it. If this circuitous mode of doing the business would take the case out of the prohibition, it would equally apply to the Missouri certificates; for they were issued by persons acting under the authority of the state, and indeed could be issued in no other way.

This prohibition in the constitution could not have been intended to take from the states all power whatever over a local circulating medium, and to suppress all paper currency of every description. The power is given to congress to coin money; and the states are prohibited from coining money. But to construe this, as embracing a paper circulating medium of every description, and thereby render illegal the

issuing of all bank notes by or under the authority of the states, will not, I presume, be contended for by any one. And I am unable to discover any sound and substantial reason why the prohibition does not reach all such bank notes, if it extends to the certificates in question.

The conclusion to which I have come on this point, renders it unnecessary for me to examine the second question made at the argument. I am of opinion, that the judgment of the state court ought to be affirmed.

Mr Justice M'LEAN.

Several cases, depending upon the same principles, were brought into this court, from the supreme court of the state of Missouri, by writs of error.

In the case of Hiram Craig and others, the declaration sets forth the cause of action in the following terms, viz: " For that whereas, heretofore, on the 1st day of August, in the year of our lord 1822, at the county, &c. the said Craig, John Moore and Ephraim Moore made their certain promissory note in writing, bearing date, &c. and then and there, for value received, jointly and severally, promised to pay to the state of Missouri, on the 1st day of November 1822, at the loan office in Chariton, the sum of one hundred and ninety-nine dollars and ninety-nine cents, and the two per centum per annum, the interest accruing on the certificates borrowed from the 1st day of October 1821, nevertheless," &c.

The general issue of non assumpsit having been pleaded in each case, the circuit court of Chariton, in which the suits were commenced, rendered judgments in favour of the plaintiff. The following entry, in the case of Craig and others, was made on the record. " And afterwards at a court begun and held at Chariton, on Monday the 1st of November 1824, and on the second day of said court, the parties by their attorneys appeared, and neither party requiring a jury, the cause is submitted to the court; therefore, all and singular the matters and things and evidences being seen and heard by the court, it is found by them, that the said defendants did assume upon themselves in manner and form as the plaintiff's counsel allege : and the court also find that the

[Craig et al. *vs.* The State of Missouri.]

consideration for which the writing declared upon and the assumpsit was made, was for the loan of loan office certificates, loaned by the state, at her loan office at Chariton; which certificates were issued, and the loan made in the manner pointed out by an act of the legislature of the state of Missouri, approved the 27th day of June 1821; entitled ' an act for the establishment of loan offices, and the acts amendatory and supplementary thereto.' And the court do further find, that the plaintiff hath sustained damages, by reason of the non-performance of the assumptions and undertakings of the said defendants, to the sum of two hundred and thirty-seven dollars and seventy-nine cents. Therefore. it is considered," &c.

An appeal was taken to the supreme court of Missouri, in which this judgment and the others were affirmed.

The first question which this case presents for consideration, arises under the twenty-fifth section of the judiciary act of 1789 ; which provides, " that a final judgment or decree in any suit, in the highest court of law or equity of a state in which a decision in the suit could be had, where is drawn in question the validity of a statute of; or an authority exercised under any state, on the ground of their being repugnant to the constitution, treaties or laws of the United States, and the decision is in favour of such their validity," may be re-examined and reversed or affirmed in the supreme court of the United States upon a writ of error.

Had not the point been settled by several adjudications in similar cases, I should entertain strong doubts whether it sufficiently appeared on the record, that the validity of the statute of Missouri was drawn in question, on account of its repugnance to the constitution. In the finding of the Chariton circuit court, the act is referred to, and the consideration. of the note is stated ; but it no where appears in the record, that the validity of the statute was contested. And as this is the only ground on which this court can take jurisdiction of the case, it would seem to me that it should not be left to inference, but be clearly stated in the proceeding.

In the supreme court of Missouri, the judgment of the circuit court was affirmed; but it does not appear what ob-

[Craig et al. *vs.* The State of Missouri.]

jections to the affirmance were urged before the court. This question, however, seems not to be open, and I yield to the force of prior adjudications. Two points must necessarily be considered in the investigation of the merits of this case.

1. Are the certificates authorised to be issued by the law of Missouri, bills of credit, within the meaning of the constitution ?

2. If they are bills of credit, is the note on which this suit was brought void ?

It is contended by the counsel for the plaintiffs in error, that any paper issued by a state, that contains a promise to pay a certain sum, and is intended to be used as a medium of circulation, is a bill of credit, and comes within the mischief against which the constitution intended to guard. In illustration of this position, a reference is made to the depreciated currency of the revolution.

During that most eventful period of our history, bills of credit formed the currency of the country ; and every thing of greater value was excluded from circulation. These bills were so multiplied by the different states and by congress, that their value was greatly impaired. This loss was attempted to be covered, and the growing wants of the government supplied, by increased emissions. These caused a still more rapid depreciation, until the credit of the bills sunk so low as not to be current at any price. Various statutes were passed to force their circulation, and sustain their value ; but they proved ineffectual. For a time, creditors were compelled to receive these bills under the penalty of forfeiting their debt ; losing the interest ; being denounced as enemies to the country, or some other penalty. These laws destroyed all just relations between creditor and debtor ; and so debased a currency produced the most serious evils in almost all the relations of society. Nothing but the ardour of the most elevated patriotism could overcome the difficulties and embarrassments growing out of this state of things.

It will be found somewhat difficult to give a satisfactory definition of a bill of credit. In what sense it was used in the constitution, is the object of inquiry.

Different nations of Europe have emitted, on various emergencies, three descriptions of paper money. 1. Notes, stamped with a certain value, which contained no promise of payment, but were to pass as money. 2. Notes, receivable in payment of public dues, with or without interest. 3. Notes, which the government promised to pay at a future period specified, with or without interest; and which were made receivable in payment of taxes and all debts to the public.

Bills of the last class were issued during the revolution; and in some of the colonies they had been emitted long before that time. In 1690 bills of credit were for the first time issued, as a substitute for money, in the colony of Massachusetts Bay, as stated in Hutchinson's history. In 1716 a large emission was made and lent to the inhabitants, to be paid at a certain period; and in the mean time to pass as money. For forty years, the historian says, the currency was in much the same state as if an hundred thousand pounds sterling had been stamped on pieces of leather or paper of various denominations, and declared to be the money of the government, without any other sanction than this, that when there should be taxes to pay, the treasury would receive this sort of money; and that every creditor should be obliged to receive it from his debtor.

The bills issued during the revolution were denominated bills of credit. In 1780 the United States guarantied the payment of bills emitted by the states. They all contained a promise of payment at a future day; and where they were not made a legal tender, creditors were often compelled to receive them in payment of debts, or subject themselves to great inconvenience and peril.

The character of these bills, and the evils which resulted from their circulation, give the true definition of a bill of credit, within the meaning of the constitution; and of the mischiefs against which the constitution provides.

The following is the form of the bills emitted in 1780, under the guarantee of congress. "The possessor of this bill shall be paid ———— Spanish milled dollars by the 31st day of December 1786, with interest, in like money, at the

rate of five per cent per annum, by the state of ———, according to an act," &c.

Bills of credit were denominated current money; and were often referred to in the proceedings of congress by that title, in contradistinction to loan office certificates. It is reasonable to suppose that in using the term "bills of credit" in the constitution, such bills were meant as were known at the time by that denomination. If the term be susceptible of a broader signification, it would not be safe so to construe it; as it would extend the provision beyond the evil intended to be prevented, and instead of operating as a salutary restraint, might be productive of serious mischief. The words of the constitution must always be construed according to their plain import, looking at their connexion and the object in view. Under this rule of construction, I have come to the conclusion, that to constitute a bill of credit, within the meaning of the constitution, it must be issued by a state, and its circulation as money enforced by statutory provisions. It must contain a promise of payment by the state generally, when no fund has been appropriated to enable the holder to convert it into money. It must be circulated on the credit of the state; not that it will be paid on presentation, but that the state, at some future period, on a time fixed, or resting in its own discretion, will provide for the payment.

If a more extended definition than this were given to the term, it would produce the most serious embarrassments to the fiscal operations of a state. Every state in the transactions of its moneyed concerns, has one department to investigate and pass accounts, and another to pay them. Where a warrant is issued for the amount due to a claimant, which is to be paid on presentation to the treasurer, can it be denominated a bill of credit? And may not this warrant be negotiated, and pass in ordinary transactions, as money? This is very common in some of the states; and yet it has not been supposed to be an infraction of the constitution.

Audited bills are often found in circulation; in which the state promises to pay a certain sum, at some future day specified. If these are inhibited by the constitution, can a state make loans of money? Can there be any difference between

[Craig et al. *vs.* The State of Missouri.]

borrowing money from a creditor, and any other person who does not stand in that relation? The amount cannot alter the principle. If a state may borrow one hundred thousand dollars, she may borrow a less sum ; and if an obligation to pay with or without interest may be given in the one case, it may in the other.

Where money is borrowed by a state, it issues script which contains a promise to pay, according to the terms of the contract. If the lender, for his own convenience, profers this script in small denominations, may not the state accommodate him? This may be made a condition of the loan. If a state shall think proper to borrow money of its own citizens, in sums of five, ten, or twenty dollars, may it not do so? If it be unable to meet the claims of its creditors, shall it be prohibited from acknowledging the claims, and promising payment with interest at a future day? The principles of justice and sound policy alike require this; and unless the right of the state to do so be clearly inhibited, it must be admitted.

In the adjustment of claims against a county, orders are issued on the county treasury; and it is common for these to circulate, by delivery or assignment, as bank notes or bills of exchange.

May a state do, indirectly, that which the constitution prohibits it from doing directly? If it cannot issue a bill or note, which may be put into circulation as a substitute for money, can it, by an act of incorporation, authorise a company to issue bank bills on the capital of the state? It will thus be seen, that if an extended construction be given to the term " bills of credit," as used in the constitution; it may be made to embrace almost every description of paper issued by a state.

The words of the constitution are, that " no state shall enter into any treaty, alliance, or confederation ; grant letters of marque and reprisal ; coin money ; emit bills of credit ; make any thing but gold and silver coin a tender in payment of debts ; pass any bill of attainder, ex post facto law, or law impairing the obligations of contracts; or grant any title of nobility."

[Craig et al. vs. The State of Missouri.]

Under the statute of Missouri, certificates in the following form were issued : " This certificate shall be receivable at the treasury, or any of the loan offices of the state of Missouri, in the discharge of taxes or debts due to the state, for the sum of ———— dollars, with interest for the same, at the rate of two per centum per annum, from this date, the ———— day of ———— 182 .

It appears by the third section of the act, that two hundred thousand dollars were authorised to be issued, of the above certificates, each not exceeding ten dollars, nor less than fifty cents. By the thirteenth section, these certificates were made receivable at the state treasury by tax gatherers and other public officers, in payment of taxes or moneys due to the state, or any county or town therein ; and they were made receivable by all officers in payment of salaries, and fees of office.

Under the fifteenth section, commissioners were authorised to loan these certificates to the citizens in the state; apportioning the amount among the several counties according to the population, on mortgages or personal security. The act provides the means by which these certificates shall be paid, and the fact is admitted that at this time they are all redeemed by the state.

The design, in issuing these certificates, seems to have been to furnish the citizens of Missouri with the means of paying to the state the taxes which it imposed, and other debts due to it. It was in effect giving a credit to the debtors of the state, provided they would give good real or personal security. Had the arrangement been confined to those who owed the state ; and had certificates been required of them, promising to pay the amount, with interest; no objection could have been urged to the legality of the transaction. And even if the state, in the discharge of its debts, had paid such certificates, the act would not have been illegal.

The state of Missouri adopted no measures to force the circulation of the above certificates. No creditor was under any obligation to receive them. By refusing them, his debt was not postponed, nor the interest upon it suspended. The

object was a benign one, to relieve the citizens from an extraordinary pressure, produced by the failure of local banks, and the utter worthlessness of the currency. Without aid from the government, the citizens of Missouri could not have paid the taxes or debts which they owed to the state, in a medium of any value. At such a crisis the law was enacted; and, as contemplated in its passage, so soon as the necessary relief was afforded, the paper was withdrawn from circulation. The measure was only felt in the benefits it conferred. No loss was sustained by the public or by individuals; unless indeed the state shall lose by the unconscionable defence set up to these actions.

It is admitted, that the expediency or inexpediency of a measure cannot be considered, in giving a construction to the constitution. But when, in giving a construction to that instrument, it becomes necessary, as it does in some instances, to look into the mischiefs provided against; and the application becomes, to some extent, a matter of inference; the question of expediency must be considered.

If the act of Missouri conferred benefits upon the people of the state, and was so guarded in its provisions as to protect them from all possible evil, no court would feel inclined to declare it to be unconstitutional and void, unless it was directly opposed to the letter and spirit of the constitution. As the spirit of that provision was to protect the citizens of the states against the evils of a debased currency; and as the act under consideration, so far as it operated upon the people of Missouri, had no tendency to produce this evil, but to relieve against it; the spirit of the constitution was not violate[1]. Was the act of Missouri against its letter? Were the certificates issued by the state " bills of credit?" They were not, if the definition of a bill of credit, as now given, be correct. Their circulation was not forced by statutory provision, in any form; there was no promise on their face to pay at any future day; in their form and substance, they bore little or no resemblance to the continental bills. They were calculated, from the manner in which they were created and circulated, to introduce none of the evils so deeply felt from the currency of the revolution.

VOL. IV.—3 H

Suppose the state of Missouri had stamped certificates with a certain value, and provided that they should be received as money, according to the denominations given them, could they have been called bills of credit? Certainly not; for they contained no promise of payment, to which the holder could give credit. Such an act, by a state, would most clearly be void; but not under the provision of the constitution, which prohibits a state from issuing " bills of credit."

Can any certificate or bill be considered a bill of credit, within the meaning of the constitution, to which the receiver must not give credit to the promise of the state? Must it not, literally, be a " bill of credit?" Not a bill which will be received in payment of public dues, when presented, but which the state promises to redeem at a future day.

A substitution of the credit of the state for money, may be considered as an essential ingredient to constitute a " bill of credit." When this is wanting, whatever other designation may be given to the thing—whether it be called paper money, or a state bill, it cannot be called a " bill of credit." The credit refers to a future time of payment; and not to the confidence we feel in the punctuality of the state, in paying the bill when presented. A bill, therefore, which is payable on presentation, is not a bill of credit, within the meaning of the constitution; nor is a bill which contains no promise to pay at a future day; but a simple declaration, that it will be received in payment of public dues.

If this course of argument appears somewhat technical, it must be recollected that the question under consideration involves the validity of an act of a state; which is sovereign in all matters, except where restrictions are imposed, and an express delegation of power is made to the federal government. The solemn act of a state, which has been sanctioned by all the branches of its power, cannot, under any circumstances, be lightly regarded. The act of Missouri having received the sanction of the legislative, executive, and judicial departments of the government, cannot be set aside and disregarded under a doubtful construction of the constitution. Doubts should lead to an

acquiescence in the act. The power which declares it null and void, should be exercised only where the right to do so is perfectly clear.

That such a power is vested in this tribunal by the constitution, which received the sanction of all the states, can only be doubted by those who are incapable of comprehending the plainest principle in constitutional law. It is a question arising under the constitution, and all such questions of power, whether in the general or state governments, belong to this tribunal. The policy of this investiture of power may be questioned; but the fact of its existence cannot be. Believing that in every point of view in which the paper issued by the state of Missouri may be considered, it is at least doubtful whether it comes within the meaning of a "bill of credit," prohibited by the constitution; I am inclined to affirm the judgment of the state court. But if this ground of the defence be admitted, does it follow that the judgment must be reversed. This presents for consideration the second proposition stated.

If the certificates under consideration were "bills of credit," within the meaning of the constitution, is the note on which this suit is brought, void?

The position assumed in the argument, that no contract can be valid that is founded upon a consideration which is contrary to good morals, against the policy of the law, or a positive statute, cannot be sustained to the extent as urged. The ground is admitted to be correct, generally; but there are exceptions which it becomes important to notice.

In the state of Pennsylvania usury is prohibited under the sanction of certain penalties, but usury does not render the contract void; a recovery may be had upon it, with the legal rate of interest. It is competent for a state to p ohibit gambling by a severe penalty; and yet to provide that an obligation given for money lost at gambling shall be valid. It may declare, by law, that all instruments for the payment of money, signed by the party, shall be held valid, without reference to the consideration. The legislative power of a state over contracts is without restriction by the constitution of the United States; except that their obligation can-

not be impaired. With this single exception, a state legislature may regulate contracts, both as to their form and substance, as may be thought advisable.

Suppose the constitution of Missouri had prohibited the emission of bills of credit, without going further; might not the legislature provide by law, that obligations given on a loan of such bills should be valid. There would be no more inconsistency in this than in the law of Pennsylvania, which forbids usury, and yet holds the instrument valid. If the constitution of the United States had provided that all obligations given for bills of credit, or where they formed a part of the consideration, should be void, there could have existed no doubt on the subject. But there is no such provision; and if the obligation be held void, its invalidity is a matter of inference, arising from the supposed illegality of the consideration. The constitution prohibits a state from " emitting bills of credit." The law of Missouri declares, substantially, that obligations given, where these bills form the consideration, shall be held valid. Is there an incompatibility in these provisions. Does the latter destroy the former, or render it ineffectual.

Suppose a state should coin money, would such money not constitute a valuable consideration for a promissory note? Would not the intrinsic value of the silver, as bullion, be a sufficient consideration? Would such a construction conflict with the constitution?

A state is prohibited from coining money; consequently the money which it may coin cannot be circulated as such. A creditor will be under no obligation to receive it in discharge of his debt. If any statutory provision of the state should be formed, with a view of forcing the circulation of such coin, by suspending the interest or postponing the debt of a creditor where it was refused, such statute would be void, because it would act on the thing prohibited, and come directly in conflict with the constitution. Such would not be the case in reference to the obligation given for this coin.

In the first place, the act would be voluntary on the part of the purchaser; and in the second, the consideration would be a valuable one. The statute sanctions not the coin, but

the obligation which was given for it. The act of creating the consideration may be denounced and punished, as in the case of usury in Pennsylvania; and yet the obligation held good. Would this construction render ineffectual the prohibition of the constitution? This may be answered by considering how ineffectual this provision must be, if its efficacy depend on making void the contract.

The loaning of this coin is only one of many modes which a state might adopt to circulate it. In the payment of its creditors, and in works of improvement, the state could always find the most ample means of circulation.

Effect is given to this provision of the constitution, by limiting it to the thing prohibited. If a state emit bills of credit, or coin money, neither can pass as money, whatever may be the regulation on the subject. No penalties have been provided to prevent such a circulation; no sanctions to enforce it would be valid.

But, it is contended, that the offence consists in circulating the bills; that being the meaning of the word "emit." Congress may issue bills of credit, and perhaps have done so in the emissions of treasury notes: is a state prohibited from circulating them? If not, it must be admitted, the violation of the constitution consists, not in the circulation of such bills, but in their creation.

The prohibition of the constitution was intended to act on the sovereignty of a state, in its legislative capacity. But there is no power in the federal government which can act upon this sovereignty. It is only when its inhibited acts affect the rights of individuals, that the judicial power of the union can be interposed.

If a state legislature pass an ex post facto law, or a law impairing the obligation of contracts; it remains a harmless enactment on the statute book, until it is brought to bear, injuriously, on individual rights. So, if a state coin money or admit bills of credit, the question of right must be raised before this tribunal, in the same manner.

The law of Missouri expressly sanctions the obligations given on a loan of these certificates. Had not this been done, and if the certificates were bills of cred t, within the

meaning of the constitution, the obligations might have been considered void, as against the policy of the supreme law of the land.

There is no pretence that there has been a failure of consideration for which the notes in controversy were given. The certificates have long since been received by the state as money, and the promissors have realized their full value. If they can avoid the payment of their notes, as they wish to do by the defence set up, it must be alone on the ground of the illegality of the consideration. Suppose the notes had been given, under the same circumstances, payable to an individual, from whom the consideration had been received; could the defence be sustained?

In such a case, there could be no allegation of a failure of consideration. The constitution prohibits the state from issuing the certificates; but the law of Missouri declares, that obligations given for these certificates shall be valid. These notes, being given for a valuable consideration, may be enforced, unless the constitution makes them void. This it does not do by express provision; and can they be avoided by inference? An inference, which does not necessarily follow, as has been shown, from the prohibition; because such a consequence is prevented by the act of Missouri. This act may be void as to the emission of the bills; but it does not follow that the part which relates to the notes must also be void. It would seem, therefore, that effect may be given to the provision of the constitution, so as to prevent the mischief, by operating upon the circulation of the bills, without extending the consequence so as to make void the contract expressly sanctioned by the law of Missouri. And if such a construction may be given, will not the court incline to give it; in order that both laws may be carried into full effect, where their provisions do not come directly in conflict?

The passing of counterfeit money is prohibited under severe penalties, by the laws of every state; and is it not in the power of a state to provide by law, that every obligation given for counterfeit paper, known to be such by both parties, shall be valid. This will scarcely be denied. And if

a state may do this, under its sovereign power to regulate contracts; may it not give validity to the notes under consideration. Had not the state of Missouri a right to provide that every citizen who should voluntarily execute an obligation for the payment of money to the state, should be held bound to pay it, although given without consideration. If this do not come within the province of legislation in a sovereign state, I know not where its powers may not be restricted. And if this may be done, can the notes under consideration be held void. If the certificates were illegally created, they were of value, and under the law of Missouri constituted a valuable consideration for the notes given. In any view, the notes which were executed being sanctioned by law, and consequently valid even without consideration, cannot be less so, when given for the certificates. I am therefore, inclined to say, not without great hesitation, as I differ with the majority of the court, that the judgment should be affirmed on this ground.

In the first place, then, from the consideration which I have been able to give this case, I am not convinced that the certificates issued by the state of Missouri were bills of credit, within the meaning of the constitution. And unless my conviction was clear on this point, my duty and inclination unite to sustain the judgment of the supreme court of Missouri. And secondly, as has been shown, it appears to me, that the contract on which this action is founded is not void; even admitting that the certificates were bills of credit [a]

All questions of power, arising under the constitution of the United States, whether they relate to the federal or a state government, must be considered of great importance. The federal government being formed for certain purposes, is limited in its powers, and can in no case exercise authority where the power has not been delegated. The states are sovereign; with the exception of certain powers, which have been invested in the general government, and inhibited to the states. No state can coin money, emit bills of credit, pass ex post facto laws, or laws impairing the obligation of contracts, &c. If any state violate a provision of the constitution, or be charged with such violation to the injury of

private rights, the question is made before this tribunal; to whom all such questions, under the constitution, of right belong. In such a case, this court is to the state, what its own supreme court would be, where the constitutionality of a law was questioned under the constitution of the state. And within the delegation of power, the decision of this court is as final and conclusive on the state, as would be the decision of its own court in the case stated.

That distinct sovereignties could exist under one government, emanating from the same people, was a phenomenon in the political world, which the wisest statesmen in Europe could not comprehend; and of its practicability many in our own country entertained the most serious doubts. Thus far the friends of liberty have had great cause of triumph in the success of the principles upon which our government rests. But all must admit that the purity and permanency of this system depend on its faithful administration. The states and the federal government have their respective orbits, within which each must revolve. If either cross the sphere of the other, the harmony of the system is destroyed, and its strength is impaired. It would be as gross usurpation on the part of the federal government, to interfere with state rights, by an exercise of powers not delegated; as it would be for a state to interpose its authority against a law of the union.

The judiciary of a state, in all cases brought before them, have a right to decide whether or not an act of the federal government be constitutional, the same as they have a right to determine on the constitutionality of an act under the state constitution: but, in all such cases, this tribunal may supervise the decisions. It is often a difficult matter to define the limitations of the legislative, the executive, and the judicial powers of a state; and this difficulty is greater in defining the limitations of the federal government. In both cases, the respective constitutions must be looked to as the source of power; but in the latter, it is often necessary to determine not only whether the power be vested, but whether it is inhibited to the state. Some powers in the general government are exclusive; others concurrent with the states. The experience of many years may be necessary to estab-

[Craig et al. *vs*. The State of Missouri.]

lish, by practical illustrations, the exact boundaries of these powers, if indeed they can ever be clearly and satisfactorily defined. Like the colours of the rainbow, they seem to intermix, so as to render a separation extremely difficult, if not impracticable. By the exercise of a spirit of mutual forbearance, the line may be ascertained with sufficient precision for all practical purposes. In a state, where doubts exist as to the investiture of power, it should not be exercised, but referred to the people; in the general government, should similar doubts arise, the powers should be referred to the states and the people.

This cause came on to be heard on the transcript of the record from the supreme court of the state of Missouri, for the first judicial district, and was argued by counsel; on consideration whereof, this court is of opinion, that there is error in the rendition of the judgment of the said court in this, that in affirming the judgment rendered by the circuit court for the county of Chariton, that court has given an opinion in favour of the validity of the act of the legislature of Missouri, passed on the 27th of June 1821, entitled "an act for the establishment of loan offices," which act is, in the opinion of this court, repugnant to the constitution of the United States; whereupon it is considered by the court, that the said judgment of the said supreme court of the state of Missouri for the first judicial district ought to be reversed and annulled; and the same is hereby reversed and annulled; and the cause remanded to that court, with directions to enter judgment in favour of the defendant to the original action.