# LUCAS, TURNER & CO. v. THE CITY OF SAN FRANCISCO.

Where a municipal corporation has the power to perform an act, and in the execution thereof the prescribed form is not followed, it has the power to subsequently ratify and confirm the informal act, so as to make it as binding as if originally done in the proper manner.

The charter of the city of San Francisco provides that when the common council think proper to open or improve a street, etc., notice shall be given, and if no protest be made, as provided, then the council shall proceed with the improvement: *Held*, that when an ordinance had passed to give the required notice, which was given, and no protest made, the full discretionary power of the council had been exercised, and it became binding as a contract between the city and the property-holders to make the improvement, the remaining acts on the part of the city being mere ministerial duties of its proper officers.

The liability of the city for street improvements is limited to the expense of improving the crossings. The remainder is to be paid by the property fronting upon the streets. The city, in contracting as to the latter, must be regarded as the mere agent or trustee, and is therefore not primarily liable.

The charter gives the contractor a direct lien upon the adjacent property for his work, but where the city has collected this money from the property-holders, she is liable to the contractor therefor, and can be compelled to return the same. The city being the trustee of the contractor, and also the agent of the property-holders, it follows that a liability created thereby is not a violation of that portion of her charter which limits the power of the corporation in contracting debts.

*Per Burnett, J.*—A comptroller's warrant, to be valid, must be in the form prescribed by the charter of San Francisco.

APPEAL from the Superior Court of the City of San Francisco.

This action was brought in the Court below, by Lucas, Turner & Co., as the assignee of Jesse L. Wetmore, to recover the sum of one hundred thousand dollars for grading Powell street, in San Francisco. The complaint contained nine counts, and stated, among other things, that in November, 1852, one William Divier was duly appointed street commissioner of that city. That said Divier, as commissioner, as he was authorized to do, on the 20th of September, 1853, entered into a contract with Jesse L. Wetmore, for the grading of Powell street, at certain specified prices for the different kinds of work therein contained. That said Wetmore performed his work according to contract, and that the officers of the city received and accepted the same. That at various times during the performance of this work, the said Wetmore presented his accounts for portions of the same, completed by him, to the comptroller of said city, who submitted the same to the common council, and that said accounts, so presented, were approved by said council, and audited by the comptroller of said city, and who therefor drew his warrants in the following form :

$858 02-100.                    CITY COMPTROLLER'S OFFICE,  ⎫
                                        (No. 961.)              ⎬
                                San Francisco, August 29, 1854. ⎭

City Treasurer pay to Jesse L. Wetmore, or bearer, the sum of eight hundred and fifty eight dollars and two cents, for grading, etc., Powell street, as per settlement, out of the street assessment fund.

                                        S. R. HARRIS, Comptroller.

C. K. GARRISON, Mayor.

Plaintiffs also aver that they took said warrants without notice of any objections thereto, and that they are *bona fide* purchasers of the same.

Plaintiffs further set forth that the defendants, under the assessment made upon the property adjacent to Powell street, had collected the sum of one hundred and twenty thousand dollars. That the whole amount of the work done by said Wetmore amounted to one hundred thousand dollars, and that it had, for a valuable consideration, been assigned to plaintiffs.

The defendants demurred to the complaint, which being sustained, and final judgment entered in favor of defendants, plaintiffs appealed.

*Baldwin & Bowman* for Appellants.

The contract, as executed, was a good and valid contract, binding on the city.

Now, no mode or form of contract is prescribed by charter; this being so, the corporation may act through its agents in making the contract. A corporation, unless expressly restrained by its charter, may contract through the agency of a select committee of its members. See Burrill *v.* Nahant Bank, 2 Met., 166.

In a city corporation, where the duties and business are complicated and multifarious, it is impossible that such contracts could be made by the council. Is it necessary that every street contract should be made by the board, and every other contract, in order to render them valid? Obviously not; for if so, then everything in connection with the whole work must be done by the council, for there is no more reason, in the nature of things, for holding the contracts than the other acts so to be done—the words embrace all of the work.

In conformity with the provisions of section two of article five of the act of incorporation, before cited, the council gave notice of the intention of the city to make certain improvements by passing the following ordinance:

Ordinance No. 409, § 1: "That the street commissioner be, and he is hereby, instructed to give notice, according to law, that the city intends grading, planking, and sewering, Powell street, from Bay to Washington streets, in conformity with the

established grade; and that the expense of so doing will be as sessed upon the land fronting on said street, except the crossings, which will be borne by the city."

The city had appointed certain officers and agents for the express purpose of superintending the work upon the streets, and attending to this part of the city business; it had prescribed the mode of contracting; the contract was *de facto* made. Under these circumstances, there was no necessity for passing an ordinance in order to give validity to this contract. The charter gave it without such ordinance.

Neither is there anything in the charter which requires an appropriation for a contract, to be made before the contract; nor is there anything which requires any appropriation whatever to be made, in order to render the contract valid and binding. An appropriation is only a means of payment; the corporation would be bound to pay at any rate; and the contractor would not be bound to take whatever the corporation chose to give. Neither does the charter prescribe that the council shall be required to particularize the terms and conditions of a contract before it can authorize such contract to be made. There is no reason of policy which so requires it, and the general rule and principle held in application to other contracts and corporations, does not so require it. But, apart from all these considerations, we contend that Ordinance No. 409 was sufficient, and did give the authority.

By the modern decisions, the contracts of corporations rest upon the same footing as those of natural persons, governed by the same rules and laws. Bank of Columbia v. Patterson, 7 Cranch, 299; Fleckner v. The Bank of the U. S., 8 Wheat., 338; Bank of the U. S. v. Dandridge, 12 ib., 64; Mott v. Hicks, 1 Cowen, 513; Chestnut Hill Co. v. Rutter, 4 Serg. & Rawle, 16; School District v. Wood, 13 Mass., 199; Union Bank v. Ridgely, 1 Har. & Gill, 324. Or arising by implication of law, either from the acceptance of an executed consideration. Bank of Columbia v. Patterson, 7 Cranch, 299; Kennedy v. Baltimore Ins. Co., 3 Har. & Johns., 367; Dunn v. St. Andrew's Church, 14 Johns., 118; Episcopal Ch. Society v. The Episcopal Church, 1 Pick., 372; Proprietors of Canal Bridge v. Gordon, 1 ib., 297. Or from ratification of acts done on behalf of the corporation by parties assuming to act as agents, although without sufficient authority. Epis. Society v. Epis. Ch., supra; Randall v. Van Vechten, 19 Johns., 60.

There is no requirement in the charter which renders it necessary for the ordinance to precede the contract. We have already shown that the council could delegate the power of contracting to the street department, and that before proceeding to do the work, public notice should be given of the intention, etc. Now, is not the charter equal to an ordinance? What does the charter provide? That in the contingency of no protest being made

by the property-holders, the council shall proceed, not to pass an ordinance, but to do the act.

The doing of the act is the legal and necessary result from the antecedent facts; and, surely, it cannot be contended that the council, by ordinance, were to be held to the necessity of re-affirming a higher law, viz.: the charter. See The Mayor of New York *v.* Furze, 3 Hill, 615; and see Brady *v.* The Mayor of Brooklyn, 1 Barb., 484, as to the effect of this ordinance as re-cognition.

So, even if a specific ordinance was necessary, the corporation must be presumed to have passed it, as we have just shown by the case last cited, that the ordinance subsequently passed affirm-ing the assessment for the work, is a sufficient compliance with the charter.

If a man voluntarily builds a house, or a road, or a sewer, may not the corporation pay for it, though it never ordered it? And why may not a corporation pay for a street opened voluntarily, as well, when it takes the benefit of it to itself, and especially when, by its own acts, it has induced the act and the idea that it was authorized?

The act of incorporation does not restrain the city from mak-ing any lawful contract the evidence of indebtedness. This is plain, because the language of the charter itself does not admit of an opposite construction. The expression, "the common council shall have no power to emit bills of credit, or to issue or put in circulation any paper, or device, as a representation of value or evidence of indebtedness," is only intended to restrain the city from issuing paper to serve as a currency, or circulate as money. The charter giving power to make a contract, in-tended to give to the contract, when made, the same effect as is given to any other person's contract. The restraining clause is only intended to prevent banking. The words "bill of credit" have a very general and undefined meaning. See Briscoe *v.* The Bank of Kentucky, 11 Peters., 314, and the Legislature, in adding the subsequent words, only meant to give those words their true and rightful interpretation. This is plainly evident from the other portions of the act of incorporation.

1. It gives authority to issue warrants.

2. It gives authority to issue bonds.

3. It provides that "nothing shall be allowed for depreciation of the warrants, bonds, or other evidence of indebtedness."

Finally, we submit that there is no distinction in any respect affecting this discussion between municipal and private corpora-tions. Ross *v.* The City of Madison, 1 Carter's Ind. R., 252; Mayor of Ludlow *v.* Charlton, 6 Mees. & Welsby, 824, and note by American Editor; Lesher *v.* The Wabash Navigation Co., 14 Ill., 87; Mayor of Lynn *v.* Turner, Cowp., 86.

*Fletcher M. Haight and William Duer* for Respondent.

No ordinance was ever passed authorizing the opening of Powell street. Notice was given of the intention to do so, which was a necessary pre-requisite; but the work was never directed to be done, nor any authority given to contract for the same.

The power to make the contract is dependent upon the power to order the improvement. This can only be done in the mode prescribed by the charter, and involves the exercise of public municipal powers. The thing to be done is for the public advantage, and not for the private advantage or emolument of the corporation, and involves the exercise of the sovereign power of taxation. Such acts are incapable of ratification, and the power granted must be exactly followed. Bailey *v.* The Mayor, etc., 3 Hill, 539; Touchard *v.* Touchard, Cal. R., July T., 1855; 2 Sanf. Superior Court R., 221; 13 Barb., 567; Doughty *v.* Hope, 3 Denio, 594; Sharp *v.* Speer, 4 Hill, 76; Thompson *v.* Schermerhorn, 2 Selden, 92; same cases, 9 Barb., 152.

The ordinance authorizing a settlement does not obviate the difficulty. If the common council could not make the contract, except in the manner prescribed by the charter, and could not ratify it, they cannot settle or compromise any claim arising under it.

The section authorizing, or rather recognizing warrants on the treasury, must be construed in connection with the seventh section, so that force may be given to both.

The warrant is an authority to receive money; it is a necessary and incidental power, for there is no mode in which money can be drawn from the treasury of a corporation but by warrant. But this does not authorize turning the warrant into a bill of exchange, or other instrument upon which an action can be sustained. The prohibition was intended to protect the people of the city against debt and taxation, and should be construed so as to carry out this intention.

The plaintiffs are not *bona fide* holders. They took the warrants as security, and without parting with value, after they were due, and with notice.

The contract assigned to them, and the warrants on their face, are express notice; and without that, they are bound to take notice for what consideration the warrants were given. Bay *v.* Coddington, 20 Johns., 637; Halstead *v.* The Mayor, etc., 5 Barb., 218; 9 Paige, 470.

They are not agents of the common council, and if so in any sense, they are agents acting under special written powers conferred by law, and of which, all persons dealing with them are bound to take notice. Story on Agency, § 76; Smith *v.* The City of New York, 4 Sandf. Sup. Court, 221, 227; 2 ibid., 481.

No corporation is liable on any contract which it has not capacity to make, or which it is prohibited by law from making;

nor in such case can a ratification be binding. Ang. and Ames, § 256; Swift v. Beers, 3 Denio, 70; Story on Bills, § 79; Broughton v. Manchester Water-Works Co., 3 Barn. and Ald., 1, 10; 5 Barb., 218; 9 Paige, 470.

BURNETT, J., delivered the opinion of the Court.

This case was decided at the October Term, 1856, and a rehearing ordered. The decision of the Court below was given against the plaintiff, upon a demurrer to the complaint. The complaint contains nine counts, setting forth the cause of the action in different forms, and the demurrer was to the whole complaint, and to each count separately, and was sustained as to all the counts. The objections raised by the demurrer can only apply to some of the counts, and for that reason, if for no other, the judgment of the Court below must be reversed. But it was evidently the intention of all parties, to obtain the decision of this Court upon all the points raised, as they involve interests of great magnitude, that must be settled sooner or later, upon appeal. As the plaintiffs have presented their case in so many different forms, to meet every anticipated state of proof, and as the questions raised apply to the different counts considered separately, it will be necessary to examine the case more in detail.

The case of Holland v. The City of San Francisco, involved some of the questions raised in this; and we must refer to our opinion in that case, for some of the reasons sustaining our views of the case now before us.

It would seem evident, from the language of the charter of the city of San Francisco, as well as from its scope and spirit, that the Legislature intended to impose all practical checks upon abuses. The corporation continued by that fundamental law, was intended to be limited, not only in the *powers* granted, but also in the *mode* of their exercise. And when, from the spirit and letter of the charter of a corporation, (especially if it be municipal,) the predominant intention is clearly manifested by the Legislature, to restrict its powers, and the mode of their exercise, within definite limits, the Courts are necessarily held to a more strict rule of construction. The Legislature but carried out the intention of the Constitution, as expressed in the thirty-seventh section of the fourth article.

If, then, it be true, that the prescribed form must be preserved, in order to bind such a municipal corporation as that of San Francisco, it would seem to follow, as a clear and logical consequence, that the doctrine of estoppel, for matters *in pais*, cannot apply to it. Being limited and restricted to certain defined *powers*, and also to certain prescribed modes, the ends contemplated by the charter could be practically defeated, as well by a departure from the *mode* designated, as by the exercise of

the prohibited powers. It also follows, that, when an act could not be done *originally*, it cannot, in any form, be ratified afterwards. It would seem equally true, that if the act itself be within the legitimate powers of the corporation, and the prescribed forms were not originally pursued, the city council, in the proper form, could afterwards ratify, or adopt, the precedent *informal* act, and it would then be as binding as if originally done in the proper mode.

This view of the case relates to the corporation, in its private, as distinguished from its public, capacity. As the owner of property, the city has a right to make contracts for its sale, lease, or improvement; and these contracts, though informal at the time, may afterwards be ratified by ordinance; provided, the vested rights of others are not impaired. An ordinance will estop the city, while acts *in pais* will not.

It is conceded in this case, that the city had power to make the alleged contract, and the only questions are:—First, was it made in the proper mode? and second, if not made in the proper mode, was it afterwards affirmed in the proper manner? The alleged contract was for work and labor performed under the following ordinances of August 19th, 1853 : " Ordinance 409— The People of the City of San Francisco do ordain as follows : Section 1. That the street commissioner be, and he is hereby, instructed to give notice according to law, that the city intends grading, planking, and sewering Powell street, from Bay to Washington streets, in conformity with the established grade; and that the expense of so doing will be assessed upon the land fronting on said street, except the crossings, wich will be borne by the city."

It may be assumed, as a correct position, that, to give effect to the intention of the city council to make this improvement, it was not necessary for the ordinance to contain any provisions found, either in existing ordinances, or in the charter, which were applicable to the case. In other words, it was necessary for the council, in order to carry out this intention, to do that only, which *remained to be done.* The provisions of the ordinances and the charter, which from their letter or spirit, were appropriate, would at once apply to this particular case, upon the passage of the Ordinance 409. This ordinance was passed in pursuance of the second section of the fifth article of the charter, which is as follows: " Section 2. Whenever the common council shall think it expedient to open, alter, or improve, any street, or alley, or to improve any public grounds thereof shall be given by publication for ten days in some daily paper. Should one-third of all the owners of the adjacent property protest against the improvement, it shall not then be made. If no such protest be made, the common council shall proceed

with such improvement, at least two-thirds of the expense of which, shall be borne by the property adjacent."

The provisions of this section, it will be perceived, are special* and peculiar. The question, whether the improvement should be made, was to be determined by two independent parties ; the city on one side, and the property-holders on the other. Without the consent of both, the same could not be made. Each party had an absolute negative upon the action of the other. And on the part of the property-holders, one-third protesting, defeated the proposition. If the one-third of the owners did not protest, the consent of the whole was conclusively presumed. The city and the property-holders, sustained to each other, substantially, the relation of parties agreeing to make an improvement for the mutual benefit of both, and to be paid for by each, in certain stated proportions. The city was the party to make the contract, and to superintend the work. In so far, the city was but the agent of the owners of the property. They were too numerous to enter into any contract, or to superintend the work. The improvement was of a mixed character, partly private, and partly public. It concerned the whole city in part, and certain individuals in particular.

In this case, the city was the moving party. The first proposition came from the common council, in the appointed form of an ordinance. It was published for ten days, as required by the charter, and no protest was made. What then was the condition of the two parties at the expiration of the ten days ? Could either party then recede from the accepted proposition without the consent of the other ? And if so, which party ? Was the obligation to proceed with the improvement, mutual or partial ?

It must be conceded, that at the end of the time limited, and no protest having been made, the owners of the property adjacent could not withdraw their consent, and prevent the city from proceeding. And if the owners could not, at that stage of the case, withdraw their consent, could the city, the other party, do so ? The charter says not; but that in such case, " the common council shall proceed with such improvement." No conditions are put in, and no discretion left. The proposition was deliberately made, and continued for ten days, during all which time it could have been withdrawn; but when once accepted, it became binding on both parties, and the improvement must proceed.

That this view is correct, is shown by the provisions of the fifth section of the same article. By the provisions of this section, the owners of the property are constituted the moving party. They make the first proposition. Upon the application of two-thirds of all the owners of property on any street, for a particular improvement, the same shall be made, but on such conditions as the common council may determine, the owners paying at least two-thirds of the expenses of such improvements. In

this case, the common council cannot refuse to proceed with the improvements, but that body may *determine the conditions,* and may, therefore, require the entire expenses to be paid by the owners. The city is not compelled, in such cases, to do more than simply let out the contract, collect the assessments, and superintend the work. This costs the city no more, as all the officers who participate in the matter are paid regular salaries; and if not, the entire charge for the particular work might be imposed upon the property-holders. The effect of these provisions is to place the city on the one side, and the owners of property adjacent to the particular improvement on the other, in the relation of independent parties able to contract, and each interested in making the contemplated improvements, for the mutual advantage of both, and each stipulating to pay in certain specified proportions. In one case, the city moves first, and in the other, the owners of the property. In either case, the other party may reject the proposition so far as the *expense* of the improvement is concerned. When the proposition is made to the city, it cannot refuse its *agency,* but may refuse to pay any part of the expense. If the city is compelled to proceed with the improvement in the one case, it is also in the other.

If these views be correct, the Ordinance 409 was but the proposition of a party competent to contract, made through its regular organs, and in the proper form, and when accepted by the other, was binding equally upon both, and must be construed in the same way as a proposition made by an individual. The mere form of the proposition does not affect its real character. If the proposition had been made by one individual, and accepted by another, there could be no question in reference to its binding effect. Until accepted, either party could withdraw; but after acceptance, neither party without the consent of the other.

In this case, the ordinance was sufficiently clear and explicit. The street to be improved is described, the improvement itself specified, the established grade referred to, and the expense to each party clearly stated. The street commissioner was the mere agent of the council to *publish* the notice; but the ordinance itself declares that the "city intends" to make a specified improvement. The ordinance is a clear decision of the council to proceed with the improvement, the owners consenting; and that they might consent or dissent, the street commissioner was required to publish the notice. The ordinance embraces two things:

1. The conditional determination to make the improvement.

2. The duty of the street commissioner to give the requisite notice.

Both these objects are accomplished by the ordinance in very concise, but accurate terms.

It then being the duty of the common council, at the expiration

of the ten days, (no protest having been made,) to proceed with the *improvement*, what *steps* were necessary under the then existing provisions of the ordinances and the charter? Was it necessary that another ordinance should be passed to authorize the contract for the work? The work itself had been determined upon by the consent of both parties, and the mode of letting it out was designated by the seventh section of the sixth article of the charter. It was not necessary, then, to pass an ordinance directing the manner of letting out the contract, nor was it necessary to ordain that the work should be let out, as that followed necessarily, from the duty of the council to proceed with it. Was it, then, necessary to designate the individual who should execute the contract for the city in this particular case, and prescribe the manner in which this should be done?

The charter provides for the election of a street commissioner, and does not define his duties, but gives this power to the council. *Art. II, § 1; Art. IV, § 11.* In pursuance of these provisions, the council passed a general ordinance in November, 1852, creating a street department, and defining its duties, as follows :

" The street department shall embrace, in its authority, the opening, constructing, regulating, improving, and repairing, of all public streets, yards, lawns, alleys, sewers, lands, places, wharves, docks, piers, and basins, and the care, supervision, and control thereof. The chief officer of this department shall be the street commissioner."

In the charter of Sacramento, section ten, there is a provision that all contracts and conveyances may be made in such manner as directed by the council, subject to the approval of the mayor. There is, however, no such express provision in the charter of San Francisco, and the approval of the particular contract by the mayor would not, therefore, be requisite to make the contract good.

It is evident that a municipal corporation must execute contracts by some agent. The authority to this agent may be general, in reference to certain classes of cases, or it may be special, in reference to a particular case. The ordinance above-mentioned is general, and seems to have been intended to give the authority to the street department, at the head of which was placed the street commissioner, to make and execute all contracts, in reference to such city improvements, as had *first* been determined to be made by the common council. The work itself, having been *first* specified by an ordinance, and the mode of letting out the same, (namely, to the lowest bidder, after notice given through the public newspapers,) having been designated by the charter, it became the duty of this department to proceed with the work, and the power to enter into contracts for that purpose is a necessary incident, resulting from the nature of the ends to

be accomplished.   When an agent is required to accomplish a certain end, or to do a certain thing, all necessary incidental powers are implied.

In this case, the thing to be done, and the manner of letting out the contract had been specifically provided for, and any deviation from the mode prescribed to the agent, would have made the contract voidable, and the same could have been set aside. In addition to this ordinance, the complaint alleges that the contract, after being executed by the street commissioner and the contractor, was presented to the council and approved.   This would seem to be amply sufficient, as to the execution of the contract.

The Ordinance 409, having been regularly passed, and the ten days' notice regularly given, and no protest having been made, there was no necessity for the passage of any other ordinance in addition to the provisions of existing ordinances and the charter, to authorize the officers of the corporation to proceed with the work.   There was no discretion then left to be exercised. It was not necessary to pass any other ordinance except to appropriate the funds necessary to pay the city's portion of the expenses. The charter provides for a board of commissioners of assessment, whose duty it was to make the assessment for the improvement. It needed no ordinance to require them to do this; and the city collector was required by the charter to make the collection, and pay over to the city treasurer.   The charter itself set aside the fund derived from this assessment, for this *special purpose*, and it was the duty of the treasurer to keep the same separate and apart from all other funds.   The amount to be paid by the owners of the property was fixed by the Ordinance 409, taken in connection with the contract.   The commissioners of assessment were bound by the charter, at the proper time, to make the assessment, and to apportion the expense among the property-holders, in proportion to the advantages respectively derived by each from the improvement.   It was the duty of the mayor to see that all the officers did their duty.   If any of the officers neglected their duty, they could be compelled to perform it by *mandamus,* upon the application of the contractor, or any other proper party.

The next question that arises is, whether the city is responsible for the cost of the entire work, in the event that the property-holders failed to pay their due proportion?   Was the city responsible as the sole contractor?   Or was the city only responsible for the portion to be paid by it?

It would seem clear, from the provisions of the charter, taken together, that the contract had to be, in form at least, a contract between the city on the one side, and the contractor on the other. But while it is a general rule that a contract is obligatory between the parties who execute it, yet it may, in certain cases, be

enforced by a party for whose benefit it was made. If, for example, A stipulate with B, to pay to C, a stated sum of money, C can enforce the contract. The same principle will apply in this case, though the circumstances be different in some respects.

While the contract must be in form between the city and the contractor, it is provided by the charter, that at least two-thirds of the expense shall be borne by the property adjacent. And by the Ordinance 409, it was provided that the expense should be assessed upon the land fronting on the street, except the crossings, which will be borne by the city. This restrictive provision of the charter must be enforced. The contractor could not look to the city for that portion of the expense designated by the ordinance, as a charge upon the land adjacent. When the parties entered into the contract, they did it with the charter and ordinances before them, and their provisions entered into and formed part of the contract, and this without any allusion being made to them in the contract itself. Both parties were bound to know the contents of the ordinances and the charter. It is true, the Courts are not bound to take judicial notice of the ordinances or by-laws of a corporation. Havens v. N. H. Asylum, 13 N. H. Rep., 532; Harker v. Mayor, etc. of New York, 17 Wend., 199. But this rule does not apply to parties who deal with the limited agents of a municipal corporation. As a general rule, parties who deal with agents of limited powers, must take notice at their own peril.

The effect of this contract was, to bind the city for the expense of the work upon the crossings, and the land adjacent for the work upon the street. As to the work upon the street, the city was but an agent, or trustee, and therefore not primarily liable. The case of Wetmore v. Campbell, 2 Sand. N. Y. R., 341, and of Brady v. The Mayor, etc., of Brooklyn, 1 Barb. S. C. R., 584, are distinguishable from the present case. It will be seen, upon examination of these cases, that the charter in each case provided, that the corporation may make certain improvements, and may assess the expense upon the owners and occupants of all the houses and lots intended to be benefited thereby. There were no restrictive words, as in the charter of San Francisco, and the expense was to be assessed to the *owners*, and not upon the property adjacent. In the New York cases, the liability was personal, while in the case of San Francisco, the liability attached to the property itself, without regard to who were the owners. Whenever the contract between the city and the property-holders was complete, as it was at the expiration of the ten days, the lien of the future contractor at once attached to the property, in whosesoever hands it might be found. In the theory of the charter, and of the Ordinance 409, the improvement of the street was local, and for the benefit of the property, and it was

not, therefore, intended to make all the corporators liable to pay for a partial benefit. The charter intended to give the contractor the very best security for his compensation, and for this reason, made the property upon the line of the improvement liable, and not the owners personally.

But it does not follow, that because the city was not primarily liable to the contractor, for the work done upon the street, it could not become liable for the amount of the assessment collected by the city, and appropriated to its own use. In that case the city would be liable. This special fund being pledged to the contractor, and having been appropriated by the city to other purposes, the city would clearly be liable to that extent. And if the city received the payment, in warrants, or other evidence of debt, so as to discharge the property, the city would be liable to the contractor. In these cases, the aggregate liabilities of the city are not increased in violation of the charter, as it is only required to return that which belongs to another. If my property finds its way, by any means, into the possession of another, I may reclaim it. So, if my money gets into his possession, I may consider him as holding it for me, and compel a return. In this case, it is specially alleged that the city collected the amount assessed upon the property adjacent, and refuses to pay the same to the contractor. The city being a trustee, for the contractor, and also the agent of the property-holders, and this in pursuance of the charter itself, can be compelled to return money, received in that capacity; and this liability is no violation of that portion of the charter which limits the power of the corporation in contracting debts. This special duty has been cast upon the city, by its organic law, and the restriction in the same law, as to contracting debts beyond a given sum, does not apply to such a case.

It remains to determine, whether the city can be made liable upon the warrants, set out in the first count of the complaint. They are all of the same form, and are as follows:

$500.                                          No. 530.
CITY COMPTROLLER'S OFFICE,
San Francisco, April 22, 1854.
City Treasurer, pay to Jesse L. Wetmore, or Bearer, the sum of Five Hundred Dollars, for grading, etc., Powell street, from Vallejo to Broadway, out of the street assessment fund.
S. R. HARRIS, Comptroller.
C. K. GARRISON, Mayor.

In the eighth section of the third article of the charter, after providing that no money shall be drawn from the treasury, unless previously appropriated for that purpose, it is further provided, that "every warrant upon the treasury shall be signed by the

comptroller, and countersigned by the mayor, and shall specify the appropriation under which it is issued, and the date of the ordinance making the same. It shall, also, state from what fund, and for what purpose, the amount specified is to be paid."

These provisions constitute a portion of the system of checks and balances provided by the charter. When it is remembered how prone municipal corporations are, to exceed and abuse their powers, to the injury of the individual corporators, and when we reflect, that the amount of revenue received and disbursed by the city of San Francisco is so large, we can, at once, see the wisdom and necessity of these checks. There is just as much necessity for these checks in the city government, as in that of the State.

It was the evident intention of the charter that a complete and accurate financial system should be practically adopted, and consistently carried out by the city authorities. For this reason, the revenues of the city were required to be distributed into different funds, and the warrants to be drawn upon the appropriate fund. No money could be drawn from, and no warrants upon, the treasury, without an appropriation. And this is the reason that each warrant must specify the appropriation, the date of the ordinance, and from what fund, and for what purpose, the amount is to be paid. These were intended as checks upon the comptroller and treasurer, and cannot be disregarded without destroying the harmony and security of the system. They are not mere directory formalities, but are efficient and necessary checks. If these requisites are not found in the warrants, the treasurer should not pay them; and if found in the warrants, and the statements are untrue, there being *no appropriation*, then they should not be paid. When these provisions are observed in the drawing of the warrants, the treasurer, at once, has it in his power to determine whether the warrants are correct or not; and, if correct, he then can pay, with safety to himself and his sureties. If not correct in every particular, he should not pay them.

The warrants in this case do not state the facts required to be stated by the charter, and are, therefore, invalid, and bind no one. Had they been drawn on the special fund for the particular improvement, then, indeed, it would not have been necessary to specify the appropriation or the date of the Ordinance 409, as the appropriation was made by the charter itself. But the warrants should have contained the other requisites. In this case, the warrants state for what purpose the money is to be paid, but not the fund from which the same was to be drawn. It is true, the street-assessment fund is mentioned, but this fund was made up by improperly mingling different special improvement funds together, in one confused mass; thus making one special fund responsible for another, when they should have been kept separate

and distinct. The comptroller had no right to draw his warrant for this *particular* improvement upon a general street-assessment fund.

Another objection to these warrants, is the fact, that they are drawn payable to Wetmore or bearer, and, upon their face, are negotiable instruments, in the same way as a bill or note payable to bearer. The different provisions of the charter, when taken together, clearly show, that the city has no power to issue such paper. But this intention may seem not so evident upon a hasty examination of the charter. If, however, we take the charter as a whole, and give force and effect to all the different provisions, we shall then be able to ascertain its true intention.

The seventh section of the third article contains this general *restrictive* clause : " The common council shall have no power to emit bills of credit, or to issue, or put in circulation any paper or device as a representative of value, or evidence of indebtedness." " But this section shall not be construed to prohibit the auditing and certifying of accounts by the proper officers of the city ; but no such audited or certified accounts shall draw interest."

As to the term " bills of credit," the Supreme Court of the United States in the case of Craig et al. *v.* The State of Missouri, 4 Peters, 410, gave this definition in the language of the Chief Justice : " Bills of credit signify a paper medium, intended to circulate between individuals, and between government and individuals, for the ordinary purposes of society." In the case of Brisco *v.* The Bank of the Commonwealth of Kentucky, 11 Peters, 313, Mr. Justice McLean, in delivering the opinion of the same Court, speaking of this definition says : " A definition so general as this, would certainly embrace every description of paper, which circulates as money." The language of the charter enlarges this prohibition, as it not only denies the power to " emit bills of credit," but also, " to issue or put in circulation any paper or device," etc.

The latter part of the seventh section, that the prohibition should not extend to the auditing and certifying accounts, by the proper officers to the city creditors, would seem to designate clearly the *character* of the paper the city was authorized to issue. These audited and certified accounts were not negotiable, and could not draw interest. Warrants can be drawn under the provisions of section eight, but to give due and practical effect to the prohibitory provision, contained in the seventh section, they should not be negotiable, and cannot draw interest. They should be drawn payable to the party entitled to them, and not to him or order—or bearer.

The charter intended to confine the expenditures of the city within its yearly revenue. This may be seen in all the prohibitory sections. But while this was the leading intent, there are certain special exceptions stated. By section five, article three,

the council shall not permit any debts to accrue, which, in the aggregate with all former debts, shall exceed the sum of fifty thousand dollars, unless the same shall be authorized by ordinance, for some "*specific object*," which ordinance must be approved by a vote of the people. The substance of this provision is, that a debt beyond the yearly revenue may be created, not to exceed fifty thousand dollars, for *any* purpose allowed by the charter; but a debt for a greater amount than fifty thousand dollars can only be created for a "*specific object*," and in the *precise mode stated.* By section six the council may *borrow money*, on the credit of the city, not to exceed the sum of fifty thousand dollars. But the ordinance shall direct the same to be paid out of the *anticipated* yearly revenue.

The debt of fifty thousand dollars, mentioned in section five, is different from the debt of the same amount authorized by section six, and they may, therefore, both exist at the same time. One is beyond the annual revenue, and the other is in *anticipation* of it, and to be paid *out* of it. Besides these debts which the council may incur, that body was authorized to fund the liabilities of the city, existing when the charter was passed. In these specified cases, the city could issue negotiable bonds, or other evidences of indebtedness, but in no other. These cases being special, constitute exceptions to the general prohibition of the seventh section. The power to create a debt bearing interest, necessarily carried with it the power to issue the negotiable evidence of that debt.

But it was the design of the charter to confine this power to issue these negotiable instruments strictly within the limits prescribed. If in ordinary cases, such paper could be issued, either no practical limit could be set to the power of the city to incur debts, or else innocent parties would be liable to loss without the means of redress. This paper would find its way into all the channels of trade; the very thing the charter intended to prevent. By confining the right to issue these negotiable securities to the few cases specified, the *facilities* for creating a greater city debt than allowed by the charter, were greatly diminished. The warrants and certified accounts not being negotiable, and drawing no interest, these circumstances would greatly diminish the temptation to issue them too freely.

Judgment reversed, and cause remanded for further proceedings.

MURRAY, C. J., and TERRY, J.—We concur in reversing the judgment of the Court below, on the first ground stated in the opinion of Judge Burnett, but differ with him as to the other questions passed upon in his opinion.