## PAGAUD *v.* THE STATE, 5 Smedes & Marshall, 491.

### FORGERY.

The words "bill of credit," as used in the constitution of the United States, mean "a paper medium, intended to circulate between individuals and between the government and individuals, as money, for the ordinary purposes of society." 4 Peters, 431; Briscoe v. Bank of Ky., 11 Peters, 257.

The statute of this state (How. & Hutch., 270), provides that "it shall be the duty of the auditor of public accounts to examine, settle and audit all accounts, claims or demands whatsoever, against the state, arising under any act or resolution of the legislature, and to grant to every claimant authorized to receive the same a warrant on the state treasury." These warrants are not "bills of credit" within the meaning of the constitution of the United States, although they may have been sometimes used by individual holders as a circulating medium and a substitute for paper money. Vide note, supra.

Whether an instrument is or is not a "bill of credit," depends upon the intention of the legislature, in the act authorizing its issue, but that intention can only be ascertained by reference to the act itself. Testimony *aliunde* to explain the motives, or to point out the object of the law-makers, is inadmissible.

On the trial of a party indicted for the forgery of auditor's warrants, the prosecution will not be allowed to prove, with a view of showing that they are bills of credit, that at the time they were issued, there was no money in the treasury to pay them, that warrants were not then redeemed, were under par, and circulated from hand to hand as money.

On the trial of the accused for forgery of auditor's warrants, besides the proof of the handwriting of the accused, there being no positive proof of the forged warrant having been seen in the possession of or uttered by the prisoner; the state proved that he was the clerk of the auditor, had official custody of his books, free access at all times to the registry, and that the forged warrants, in all material respects, corresponded with the genuine ones in the register; whereupon the prisoner proposed to prove that the registry was not always, or generally, in his custody, but was carelessly thrown about the office, accessible to all who might casually enter it, and often with auditor's office itself, for a considerable time, in the care of a single servant; *held*, that the testimony offered by the accused was proper rebutting testimony and should have been admitted.

Error to the circuit court of Warren county.

Three cases against the accused were submitted together.

At the circuit court of Hinds county, the grand jury found a

true bill of indictment against the prisoner for forgery of an auditor's warrant. The warrant was in these words :

No. 48.                              $115.

State of Mississippi, Auditor's Office.

Pay to Daniel Thomas, or order, the sum of one hundred and fifteen dollars, on account of the appropriations for 1840 department, and for so doing this shall be your warrant.

Given under my hand and seal of office, this 5th day of March, Anno Domini, 1840.

A. B. Saunders,<br>Auditor Public Accounts.

To the State Treasurer.

The prisoner was found guilty, and on the trial the following exceptions were taken and made part of the record :

" Be it remembered, that these causes came on to be tried, by consent, together; and considerable evidence having been adduced on both sides, touching the handwriting upon the warrants described in the indictments as forged, and on other points; it having been explicitly proved in particular, that the defendant had been before the date of said warrants, and that he was at the time, and for some time thereafter, a deputy in the auditor's office, whence said warrants emanated, and as such had held custody of the books and papers of said office severally, and was familiar with the proceedings occurring in the same; the evidence in regard to the signatures upon said warrant being of a conflicting character, a portion of the same consisting of the belief of witnesses that the signatures were defendant's, whilst another part consisted of statements of an opposite belief; it having been likewise proved that a certain book offered in evidence as the *Register* of said office, and containing a specific description of all the warrants issued from the same, including name of payee, amount, date, etc., etc., was chiefly in the handwriting of accused, and that he had the official custody of said books, enjoyed free access to it at all times; it having been also proved, at this stage of the case, that the warrants described in the indictment corresponded in all material respects with the descriptions of the genuine warrants in said register; it was proposed by counsel for the prisoner to introduce testimony of said auditor's office

having been generally kept during the time of A. B. Saunders, the principal of defendant, in a loose and careless manner; that said register book was not always, or generally, in the strict custody and keeping of said defendant, but usually to be found negligently thrown about the office, sometimes in one place, and sometimes in another, and accessible to all who might casually enter the office; that said Saunders was in the habit of leaving blank-printed warrants at the office, signed by him, to be filled up and used in his absence; that there were numerous occasions when said auditor's office was open for a considerable time under the care of a single servant.    Appropriate questions were asked by prisoner's counsel for the purpose of bringing out this testimony, with a view of rebutting the presumption that the prisoner was the guilty person.    When these questions were thus propounded, no witness had proved, nor did any witness prove at any subsequent period of the trial, that he had seen the defendant execute any of the writings in question; nor did any witness prove that he had known of said Pagand's selling or disposing of any of said warrants, or that any of them were either found in, or directly traced by positive evidence to his possession. But the court refused to permit said questions to be answered, or said evidence to be given.    Defendant's counsel, with a view of proving said warrants to be bills of credit, in the sense of the federal constitution, and consequently nullities, the forgery of which could not be legally criminal, offered evidence that, at the time of the issuance of said warrants there was no money in the state treasury for their redemption; that the redemption of them by the government did not go on at all; that they were generally under par in the market, but circulated from hand to hand as money; they were of convenient denominations, so as to be suited to currency purposes; and that various statutes of the State of Mississippi evidenced on the part of the government of the same, a recognition of said warrants as money, and recognized the fact that they were not expected to be redeemed on demand or according to their face, but the court acceded that no proof beyond the face of the warrants themselves could be properly adduced to establish their legal character, and would not permit suitable questions propounded by counsel, to be re-

sponded to;" to which various opinions and refusals of the court exceptions were taken and signed.

Motion for a new trial, and motion in arrest of judgment were made, and were overruled.

*L. Lea*, *H. S. Foote*, and *Geo. S. Yerger* for the plaintiff in error.

*Jno. D. Freeman*, attorney general.

CLAYTON, J.:

This was an indictment for the forgery of certain instruments, termed auditor's warrants, purporting to have been issued by the State of Mississippi.

The bill of indictment was found in the county of Hinds, but the *venue* was charged to Warren, where a trial was had, which terminated in the conviction of the prisoner. Various errors have been assigned, and many grounds taken to reverse the judgment, but we do not deem it necessary to notice them all.

It was urged in argument, with great zeal and earnestness, that the auditor's warrants of this state, are bills of credit emitted by the state, that they thus come within the prohibition of the Constitution of the United States; that they are void, and that it is no crime to counterfeit them.

To determine this point, it is necessary to ascertain what is the precise meaning of the term "bill of credit." There is no better means of doing this than the adoption of the definition, or rather description, of a bill of credit, given by the supreme court of the United States, in the case of *Craig, et al.* v. *The State of Missouri*, 4 Peters, 431. That court says: "In its enlarged, and perhaps literal sense, the term bill of credit may comprehend any instrument by which a State engages to pay money at a future day; thus including a certificate given for money borrowed. But the language of the Constitution itself, and the mischief to be prevented, which we know from the history of our country, equally limit the interpretation of the terms. The word emit is never employed in describing those contracts, by which a State binds itself to pay money at a future day, for services actually received, or for money borrowed

for present use; nor are instruments executed for such purposes, in common language, denominated bills of credit. To emit bills of credit, conveys to the mind the idea of issuing paper, intended to circulate through the community for its ordinary purposes as money, which paper is redeemable at a future day. This is the sense in which the terms have been always understood."

Again, in the same opinion, the court says, "The term has acquired an appropriate meaning; and bills of credit signify a paper medium, intended to circulate between individuals, and between government and individuals, for the ordinary purposes of society." In the farther progress of the opinion, the term seems to be regarded as synonymous with paper money issued by a state.

The law of this state, which authorizes the issuance of auditor's warrants, is in these words: "It shall be the duty of the auditor of public accounts to examine, settle, and audit all accounts, claims, or demands whatsoever, against the state, arising under any act or resolution of the legislature, and to grant to every claimant, authorized to receive the same, a warrant on the state treasury." H. & H., 270. Upon this warrant or certificate of the auditor, the treasurer is authorized to make payment, and in no other way.

A comparison of this law of our state, with the definition of a bill of credit, above given, satisfies us entirely that an auditor's warrant, issued according to the law, is not a bill of credit, within the prohibited sense of the term. It is not issued to form a circulating medium for the community, nor to operate as a substitute for paper money. That they have been sometimes so used by the individual holders, cannot alter their legal effect. They are invariably an acknowledgment of indebtedness for services actually rendered, and to say that they are repugnant to the constitution, and void, would deprive the state of an important means which it has adopted to prevent frauds and impositions upon the treasury. That the law has not fully answered this end, tends only to prove the imperfection of all human legislation when directed against fraud.

It was also urged as error upon this branch of the case,

that the court erred in rejecting the testimony, which was proposed to be introduced, in order to show that at the time the warrant was issued, there was no money in the treasury to take it up, that warrants were not then redeemed, that they were under par, but circulated from hand to hand, as money, and thus to show that they were bills of credit. It is said by counsel that the issuing of bills of credit is a question of intent, and that evidence was admissible to show the intent. It may be conceded that the intent is an essential point of inquiry in this case, and yet it will not follow that the evidence offered was admissible to show the intent. The intent, which must stamp the character of this instrument, is that of the legislature, which enacted the law; not of the officers who were to execute it, or of the persons who received the warrants. The legislative intent can be deduced from the legislative acts alone. In construing statutes, courts may look to the history and condition of the country as circumstances from which to gather the intention. Testimony to explain the motives which operated upon the law-makers, or to point out the objects they had in view, is wholly inadmissible. It would take from the statute law every semblance of certainty, and make its character depend upon the varying and conflicting statements of witnesses. We think, therefore, the evidence was properly excluded.

The next point we shall notice, likewise grows out of the exclusion of testimony in the court below. There was no direct evidence on the part of the prosecution of the guilt of the prisoner. In other words, no one had ever seen him execute any one of the instruments, nor had any of them been seen in his possession, nor was there any proof that he had ever uttered or passed one of them. The evidence in regard to the signature upon the warrants was of a conflicting character; a part of the witnesses believed that the signatures were in the handwriting of the prisoner, and others expressed an opposite belief. It was also in evidence that the prisoner was a clerk in the auditor's office, that he had the official custody of the books of the office, including the register, in which a description of all the warrants which were issued was inserted; that he had free access to them at all times, and that the warrants described in

the indictment corresponded in all material respects with the description of the genuine warrants in the register. The counsel for the prisoner then proposed to prove, in order to rebut the presumption of his guilt, that the register was not always, or generally in the strict custody or keeping of the prisoner, but usually to be found negligently thrown about the office, sometimes in one place, sometimes in another, and accessible to all who might casually enter the office; and that there were numerous occasions when the auditor's office was open for a considerable time under the care of a single servant. This evidence was objected to by the counsel for the state, and excluded. Its admissibility depends solely upon the point whether it is to be regarded as rebutting testimony or not.

There was no positive evidence, according to the bill of exceptions, of the prisoner's guilt. The testimony as to his handwriting was contradictory. Had the prosecuting attorney submitted the case upon that testimony, this question could not have arisen. But to strengthen the case for the state, he proved the opportunities to commit the crime, and the facility of doing so with probable impunity and exemption from detection. This was no more than presumptive testimony. To rebut the presumption of guilt thence arising, the prisoner offered to prove that similar opportunities were presented to others. This offer was rejected.

In this, we think, the court erred. The circumstances thus proven against the prisoner were calculated to have weight against him, and it would be but just and proper to hear the rebutting proof. We cannot tell what influence they had with the jury. If the state proved even more than was necessary to produce a conviction, still, if part of the testimony were illegal, the judgment must be reversed. If the presumptive proof last introduced were wholly unnecessary to the prosecution, it cannot deprive the defendant of his right to offer rebutting testimony. For this error the judgment will be reversed, and a new trial granted.

As the result is thus in favor of the prisoner, we shall not consider the exceptions to other portions of the proceedings.

Judgment reversed, new trial granted, and prisoner remanded.