## GOWEN *v.* SHUTE.

1. BILLS AND NOTES. *Estoppel.* A promissory note, the consideration of which was the loan to the maker of certain State notes, which circulated as money at the date of the loan, and which were valuable as money, cannot be avoided upon the ground that they were unlawfully issued by the State, the maker having used them as money, and derived benefit from them, cannot be heard to rely on such a defense.

Cases cited: Crockett *v.* Alexander, 5 Heisk., 107; Orchard *v.* Hughes, 1 Wall., 74.

2. BILL OF CREDIT. *Constitutional law.* A bill of credit, such as a State is inhibited from issuing, is a bill drawn by the State, and resting merely on its credit for payment; and a note or bill drawn by the

State, the payment of which is to be made out of a fund pledged for that purpose, is not such a bill of credit.

Authorities cited: Briscoe *v.* Bank of Kentucky, 11 Peters, 314; Darrington *v.* State of Alabama, 13 How., 16; Craig *v.* State of Missouri, 4 Peters, 431.

FROM MAURY.

Appeal from the Circuit Court. W. C. McLEMORE, Judge.

No briefs in this case.

SNEED, J., delivered the opinion of the Court.

The action was upon a promissory note, and was brought by appeal from a judgment of a Justice of Davidson County into the Circuit Court of said county, where the matters in controversy were submitted to the Judge presiding, without the intervention of a jury. His Honor rendered judgment for the plaintiff, in affirmance of the judgment of the Justice.

The defendant appeals in error, and insists that the contract cannot be lawfully enforced against him, because, as he alleges, the promissory note was executed for a consideration which was unlawful.

It is shown that the defendant, in the State of Mississippi, during the war, borrowed of the plaintiff the amount of the note in a State currency then circulating in that State, called, in popular parlance, "cotton money." He executed the note in controversy for the amount so borrowed, and while he does not

show that he ever paid back or tendered any portion of the currency thus borrowed, or that he was injured by the loan, or lost any part of the amount by depreciation, he nevertheless insists that the contract was a nullity, and he is not bound in law to pay the note.

We may observe, at the threshold, that there is a growing disposition manifest in the rulings of the Courts as they get farther from the late great sectional conflict, to resolve all deficiencies growing out of the belligerent relations into a mere question of good faith and moral obligation in adjudging the validity of mere private contracts between man and man. And these rulings rest upon the soundest principles, as well of morality as of law. It would seem that no citation of authority is necessary to sustain the proposition that if one borrows of another an amount of currency which, though issued unlawfully, nevertheless served to buy the borrower's food and raiment, and pay his debts without loss, he ought not to be heard to deny his liability because the currency, which would have been alike valuable to his friend if he had retained it, was, in fact, issued originally without lawful authority. There is a wholesome principle of morality which underlies these questions, which has cause to be chrystalized into a cannon of the law, which compels a party to perform his contract when he has enjoyed the full benefit of it, and excludes defences which are foreign to the actual merits of his contract, and his moral obligation to discharge it. A good illustration of it is

furnished in the case of *Orchard* v. *Hughes*, 1 Wall., 74. A bill had been filed in that case to foreclose a mortgage. The defendant set up, by way of answer, that a part of the consideration of the mortgage consisted of the bills of the Bank of Tekama, of the Territory of Nebraska; that this bank, though chartered, had never been approved of by Congress, as was necessary; that the bank was never organized; that it was a device to deceive the public; that its notes were fraudulently issued and put in circulation without authority of law, and were of no validity or value whatever. But the answer showed that the bills were current and in circulation at the time, and does not show that they proved worthless in the respondent's hands, or that they had ever been tendered back. But many of them had been paid away to respondent's creditors, some to one Davis, in whose hands they did become worthless. The Court held that defendant was not in a condition to resist the complainant's demand on account of the character of the said currency. "The fatal defect in both the answer and the proof," say the Court, "is that, admitting every allegation against the legality of the bank charter, and of the worthlessness of the paper issued by the bank, the defendant has not been the sufferer. The bills he used in payment of his debts while they were current in the community, and he has not taken them back, either voluntarily, assuming that he might have done so, and set up the fact as a defence, nor has he been subjected to the repayment of the debts he discharged by the use of

them, and even were he permitted to succeed in re-
ducing the present demand by rebating the bank bills
received by him, it does not appear that he was under
any obligation to account for that amount to the credi-
tor or creditors to whom he paid them." 1 Wall., 74.

This Court has constantly held, also, that contracts
between private citizens for the loan of Confederate
Treasury notes or Bank of Tennessee notes, issued after
the beginning of the civil war, will be enforced accord-
ing to these terms. *Crockett* v. *Alexander*, 5 Heisk.,
107. And these principles are decisive of this case.

But it is said that the currency borrowed in this
case, and constituting the consideration of the note, were
bills of credit, and issued by the State of Mississippi
in violation of the Constitution of the United States,
inhibited the several States from issuing bills of credit.
And so it may be said of Confederate Treasury notes,
that they were issued in violation of the supreme
organic law, but yet both the Courts of the States and
the United States are constantly enforcing contracts
having no other consideration, upon the *jus excelsior* of
common right and moral obligation. We need not,
therefore, enter upon that vast domain of inquiry upon
which private rights are to be determined by reference
to the principles of the laws of war, or the belligerent
relations of States and Commonwealths.

It is sufficient to say, in response to the able argu-
ment of defendant's counsel on this branch of the case,
that in the opinion of this Court, the notes in ques-
tion are not bills of credit in the sense of the Con-

stitution. The currency in question was issued and put into circulation in Mississippi during the late civil war, under an Act passed December 19, 1861, entitled, "an Act authorizing the issuance of treasury notes as advances on cotton." The notes were in the form following:

"On demand, after proclamation made to present, the State of Mississippi will pay the bearer the sum of ———— dollars, out of proceeds of cotton pledged for the redemption of this note at the Treasurer's office in Jackson, Mississippi. Issued this ———— day of ————, 186—."

They were signed by the Auditor of Public Accounts and the Treasurer of the State, and were receivable in payment of all dues to the State and counties except the military tax. The auditor was authorized to issue them to the people upon a *pledge of cotton*, which the citizen bound himself to deliver on proclamation of the Governor, at some Confederate seaport, at the rate of five cents per pound. In consideration of this cotton, so pledged by the citizen, under bond and security for his faithful performance of the stipulation of his contract, the State issued to him this cotton currency. The fund arising from the sale of the cotton by the State was to be set apart, when realized, for the redemption of these issues, thus making them not merely dependent upon the faith and credit of the State for their redemption, but upon the specific pledge of this cotton fund. The special characteristic of a bill of credit issued by a State, as defined by the Supreme

Court of the United States, is, that it is a bill drawn and resting merely on the credit of the State, as contra-distinguished from a fund constituted or pledged for the payment of the bill. *Briscoe* v. *Bank of Kentucky,* 11 Pet., 314. It must be intended to circulate as money. But it must issue solely upon the credit of the State, and upon the faith and credit of no specific fund constituted for its redemption. *Darrington* v. *State of Alabama,* 13 How., 16; *Craig* v. *State of Missouri,* 4 Pet., 431, *et seq.* The currency in question, then, is not based on the general credit of the State of Mississippi, but a particular fund has been set apart specially for its payment, and this distinguishes it from the bills of credit which lie under the ban of the organic law. The Statute in question is evidently the work of some thoughtful lawyer, who was studying in its framework here to avoid a collision with the Constitution of the Confederate States, which contains a like inhibition, and which had been promulgated prior to the enactment of the Statute.

We hold, however, in this case, upon other considerations hereinbefore referred to, that the defendant is liable upon the note in controversy, irrespective of the question whether the notes called "cotton money" are bills of credit or not.

Let the judgment be affirmed.